# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BILYE NORDWALL, in her capacity as
Personal Representative of JAMES DAVIS,
Deceased,

       Plaintiff,

vs.                                                                                    No. CIV 12-0429 JB/WPL

PHC-LAS CRUCES, INC., a New Mexico corporation,
d/b/a MEMORIAL MEDICAL CENTER,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant PHC-Las Cruces, Inc.'s Motion for Partial Summary Judgment on Plaintiff's Claim Under the Rehabilitation Act and Memorandum in Support, filed September 20, 2012 (Doc. 41)("Motion for Summary Judgment"). The Court held a hearing on November 28, 2012. The primary issues are: (i) whether Plaintiff Bilye Nordwall's cause of action under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, brought in her capacity as personal representative of her son, James Davis, deceased, survived J. Davis' death; and (ii) whether PHC-Las Cruces, Inc. d/b/a Memorial Medical Center ("Memorial Medical") intentionally discriminated against J. Davis by acting with deliberate indifference to a substantially likely violation of the Rehabilitation Act during J. Davis' February, 2009, admission to Memorial Medical. The Court will grant the Motion for Summary Judgment. The Court concludes that the United States Court of Appeals for the Tenth Circuit would incorporate the applicable New Mexico law to determine whether Rehabilitation Act claims survive a claimant's death. Because the Court concludes that the Tenth Circuit would look to whether an intentional tort claim abates at the time of the claimant's death as the

applicable New Mexico law, and because the Tenth Circuit has held that an intentional tort claim abates at the time of a claimant's death, the Court concludes that J. Davis' Rehabilitation Act claim abated at the time of his death.  Accordingly the Court will grant summary judgment in favor of Memorial on this basis, and dismiss with prejudice B. Nordwall's Rehabilitation Act claim.  As an alternative basis, the Court will grant summary judgment in favor of Memorial Medical on B. Nordwall's Rehabilitation Act claim, because B. Nordwall has not established a genuine issue of material fact whether Memorial Medical intentionally discriminated against J. Davis under § 504 of the Rehabilitation Act, and cannot, therefore, recover compensatory damages.  She has failed to show Memorial Medical acted with deliberate indifference to J. Davis' federally-protected rights, because there is no genuine issue of material act whether policymakers knew of a substantially likely violation to J. Davis' rights under the Rehabilitation Act and then failed to act to prevent such a violation.  Because no federal law claims remain after the Court dismisses the Rehabilitation Act claim, the Court declines to exercise supplementary jurisdiction over the state-law claims, and will remand the case to state court.

## FACTUAL BACKGROUND

This case arises from the allegations of Bilye Nordwall, J. Davis' mother, that Memorial Medical violated J. Davis' rights under the Rehabilitation Act during his stay at Memorial Medical from February 7, to February 23, 2009.  See First Amended Complaint ¶¶ 66-77, at 10-11, filed in state court on March 23, 2012, filed in federal court on April 24, 2012 (Doc. 1-1)("Complaint").  Memorial Medical is a hospital located in Las Cruces, New Mexico.  See Complaint ¶ 8, at 2 (setting forth this fact); Answer to First Amended Complaint ¶ 9, at 2 (Doc. 4)("Answer")(not controverting this fact).

As a result of an infection that occurred shortly after his birth, J. Davis became profoundly deaf.  See Response to Motion for Partial Summary Judgment ¶ 15, at 4, filed October 19, 2012 (Doc. 47)("MSJ Response")(setting forth this fact); Defendant PHC-Las Cruces, Inc.'s Reply in Support of Motion for Partial Summary Judgment Regarding Plaintiffs' Rehabilitation Act Claim at 2, filed November 9, 2012 (Doc. 53)("Reply")(not controverting this fact).  J. Davis could not hear anything below the ninety decibel range.  See MSJ Response ¶ 21, at 5 (setting forth this fact); Reply at 3 (not controverting this fact).  Nonetheless, J. Davis communicated verbally to some degree.  See Plaintiff's Supplemental Response to Motion for Partial Summary Judgment ¶ 6, at 2, filed January 22, 2013 (Doc. 61)("Supplemental Response")(stating that J. Davis' verbal communication was limited, especially after he lost his teeth); Defendant PHC-Las Cruces, Inc.'s Sur Reply in Support of Its Motion for Partial Summary Judgment Regarding Plaintiffs' Rehabilitation Act Claim ¶ 4, at 2, filed February 4, 2013 (Doc. 62)("Surreply")(not controverting this fact).  Additionally, J. Davis used sign language, lip reading, and writing to communicate during his February, 2009, admission at Memorial Medical.[1]  See Reply ¶ 5, at 2 (setting forth this fact); Supplemental Response at 1 (not

---

[1] J. Davis communicated through writing.  See Motion for Summary Judgment ¶ 18, at 6 (stating that J. Davis communicated with healthcare providers in multiple ways, including writing).  Each party disputes, however, this writing's efficacy for relaying the communication's full meaning.  B. Nordwall asserts: "While James Davis could write some notes back and forth, for full understanding, he needed another process."  Supplemental Response ¶ 6, at 2.  B. Nordwall supports this statement by pointing the Court to Steve Davis' Deposition in which he evaluates J. Davis' understanding of written materials, stating that J. Davis' comprehension level of written materials was at a third, or fourth, grade level.  See Deposition of Steve Davis at 19:3-11 (taken November 28, 2012), filed January 22, 2013 (Doc.61-2)("S. Davis Depo).  Defendant disputes this characterization of J. Davis' reading and writing comprehension:

Mr. Davis commonly used writing to communicate . . . The medical records in this case, as well as the medical records of [J. Davis'] past hospitalizations are littered with examples of his ability to communicate in writing. . . . The only source for Plaintiff's assertion that it is an undisputed fact that [J. Davis'] reading level was limited to the third or fourth grade comes from the speculative

controverting this fact).  J. Davis' stepfather, Carl Nordwall, understood J. Davis' speech.  See Deposition of Carl Nordwall at 24:15-16 (taken August 28, 2012), filed November 9, 2012 (Doc. 53-1)("C. Nordwall Depo.").  See Reply ¶ 5, at 2 (setting forth this fact); Supplemental Response at 1 (not controverting this fact).  J. Davis had a good vocabulary for a deaf person.  See Reply ¶ 5, at 2 (setting forth this fact); Supplemental Response at 1 (not controverting this fact). Additionally, C. Nordwall stated that J. Davis was "perceptive in reading people's face -- or lips and faces, expressions, gestures, and all of that."  C. Nordwall Depo. 24:24-25:3.  See Reply ¶ 5, at 2 (setting forth this fact); Supplemental Response at 1 (not controverting this fact).

Signing is referred to as "manual communication."  Deposition of Bilye Nordwall at 46:16-17 (taken August 27, 2012), filed November 19, 2012 (Doc. 47-1)("B. Nordwall Depo").  J. Davis' mother, B. Nordwall, is a trained signer who is familiar with three different types of sign.  See MSJ Response ¶ 18, at 5 (setting forth this fact); Reply at 3 (not controverting this fact). American Sign Language ("ASL") is grammatically different than English.  See B. Nordwall Depo. at 46:18-20. J. Davis was most comfortable, in manual communication, with American

_____

testimony of Steve Davis.  Mr. Davis is far from an expert in reading comprehension, and there is no record of any testing performed regarding his reading and writing ability.

Surreply ¶ 4, at 2 (setting forth this fact).  Local Rule 56.1(b) of the United States District Court for the District of New Mexico provides in part:

The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the fact, or else the fact is deemed admitted. N.M.LR-Civ. 56.1(b).  Memorial Medical "specifically controverts" that, for J. Davis, writing insufficiently communicated information. D.N.M.LR-Civ. 56.1(b).

- 4 -

Sign Language ("ASL").  <u>See</u> MSJ Response at ¶ 16 at 5 (setting forth this fact).[2]   As a signer,

B. Nordwall communicates the substance of messages, whereas a certified interpreter translates

conversations verbatim.  <u>See</u> MSJ Response ¶ 18, at 5 (setting forth this fact); Reply at 3 (not

controverting this fact).

   B. Nordwall accompanied J. Davis to some of his medical appointments.  <u>See</u> MSJ

Response ¶ 22, at 5 (setting forth this fact).[3]   In her capacity as a signer, B. Nordwall could not

translate anything medically technical.  <u>See</u> MSJ Response ¶ 22, at 5 (setting forth this fact);

Reply ¶ 7, at 3 (not controverting this fact).  In general, interpreters are often necessary for deaf

patients to understand treatment options and to obtain informed consent.  <u>See</u> Supplemental

Response ¶ 10, at 3 (setting forth this fact); Surreply at 4 (not controverting this fact).  Before his

---

   [2] B. Nordwall asserts that J. Davis "was most comfortable communicating by use of American Sign Language."  MSJ Response at ¶ 16 at 5.  Memorial Medical, however, disputes this fact: "[T]he record actually indicates that [J. Davis] rarely used American Sign Language outside of communications with the family," and, in those communications, he also relied on "writing and lip reading."  Reply ¶ 5, at 2.  Memorial Medical adds that B. Nordwall failed to "cite a single example, except possibly one instance in criminal court, in which Mr. Davis ever used a sign language interpreter to communicate with anyone."  Reply ¶ 5, at 2-3.  <u>See</u> Ex. B to Reply; B. Nordwall Depo. at 174:5-20 (Doc. 53-2).  Memorial Medical's assertion that J. Davis rarely used ASL outside of familial communications does not "specifically controvert" that J. Davis was "most comfortable" communicating by ASL, but rather may be an additional fact: there is no instance on the record in which J. Davis ever used an ASL interpreter.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

   [3] B. Nordwall proposes the following as undisputed fact: "Mrs. Nordwall had to accompany James to his doctors' appointments to sign for him, but she could not communicate anything technical."  MSJ Response ¶ 22, at 5.  <u>See</u> B. Nordwall Depo. at 89:22-90:8.  Memorial Medical disputes this fact: "While Ms. Nordwall intermittently accompanied her son to medical appointments, she did not always do so.  Indeed, Mr. Davis frequently attended medical appointments on his own, communicating using oral and written communications with treaters when he did so."  Reply ¶ 7, at 3.  To support its assertion, Memorial Medical refers the Court to B. Nordwall's Depo., in which she states: "Some of the time I would go with [J. Davis] if they contacted me."  B. Nordwall Depo. at 151:20-24; <u>id.</u>152:10-14.  B. Nordwall's Depo. does not controvert that she attended J. Davis' medical appointments to act as a signer, but it does specifically controvert that she attended <u>every</u> medical appointment with J. Davis (emphasis added).

February 2009 stay at Memorial Medical, J. Davis demonstrated an ability to communicate with healthcare providers in writing.  See Motion for Summary Judgment ¶ 20, at 6 (setting forth this fact).[4]

Memorial Medical admitted J. Davis on February 7, 2009, and discharged him February 23, 2009.  See MSJ Response ¶ 23, at 5 (setting forth this fact); Reply at 3 (not controverting this fact).  J. Davis suffered from chronic obstructive pulmonary disease, cor polmonae, pulmonary

---

[4] B. Nordwall asserts that this fact is "immaterial."  MSJ Response ¶ 11, at 4.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, No. CIV 09-0457 JB/WDS, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J).  In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M. 2012)(Browning, J.), the Court explained that, because the proper course is to determine relevance of facts in the analysis section, rather than the factual background section, objecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.

> D. Mitchell's argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.  Immateriality is D. Mitchell's most consistent argument regarding the Plaintiff's undisputed material facts.  See Response at 11-12 (asserting that facts 1-6 and 7-9 are immaterial).  The Court notes this argument, but will not address it for each fact which D. Mitchell does not dispute but considers immaterial, in the factual section; the Court will, of course, address materiality and relevance in the analysis.  See Wilson v. Jara, 866 F.Supp.2d 1270, 1276-79, No. 10-0797, 2011 WL 5822729, at *2 (D.N.M. Oct. 17, 2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address [United States v. Abdendi 361 F.3d 1282 (10th Cir. 2004),] at this time, but will consider it in its legal analysis."); Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;] [l]egal argument should be reserved for separate portions of the brief.'").

O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.  The Court thus deems these facts admitted and will properly determine their relevance in the analysis section.

arterial hypertension, congestive heart failure, and Hepatitis C.[5]   See Motion for Summary

Judgment ¶ 9, at 4 (setting forth this fact); MSJ Response ¶ 8, at 4 (not controverting this fact).

J. Davis required supplemental oxygen at all times.   See Motion for Summary Judgment ¶¶ 10,

at 4 (setting forth this fact); MSJ Response ¶ 8, at 4 (not controverting this fact).   J. Davis often

refused to wear the non-rebreather oxygen mask.   See Motion for Summary Judgment ¶¶ 11, at 4

(setting forth this fact); MSJ Response ¶ 8, at 4 (not controverting this fact).   As a result, J. Davis

experienced life-threating oxygen deprivation.   See Motion for Summary Judgment ¶¶ 12, at 5

(setting forth this fact); MSJ Response ¶ 8, at 4 (not controverting this fact).   Because of these

symptoms, healthcare providers attempted to treat him with supplemental oxygen, and J. Davis

was sometimes combative during his treatment at Memorial Medical.[6]   See Motion for Summary

---

[5] Chronic obstructive pulmonary disease ("COPD") is "the general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied." Stedman's Medical Dictionary 554 (28th ed. 2006).   See id. at 645 (defining etiologic as relating to etiology, which is the science and study of a disease's cause).   Cor pulmonale may be either acute or chronic.   Chronic cor pulmonale is "characterized by hypertrophy of the right ventricle resulting from disease of the lungs, except of the lung change in diseases that primarily affect the left side of the heart and pulmonary artery and excluding congenital heart disease." Id. at 440-41.   Acute cor pulmonale is "characterized by dilation and failure of the right side of the heart due to pulmonary embolism." Id. at 440-41.   In both chronic and acute cor pulmonale, "characteristic electrocardiogram changes occur, and in later stages there is usually right-sided cardiac failure." Id. at 440-41.   Pulmonary hypertension is "in the pulmonary circuit; may be primary, or secondary to pulmonary or cardiac disease." Id. at 928.   Congestive heart failure is the "inadequacy of the heart so that as a pump it fails to maintain the circulation of blood, with the result that congestion and edema develop in the tissues." Id. at 699.   Hepatitis C is "a flavivirus, the etiologic agent of hepatitis C; detection of viral RNA in plasma confirms the presence of infection." Id. at 876.   See Stedman's Medical Dictionary, supra, at 742 (defining flavivirus as "a genus in the family Flaviviridae that includes yellow fever, dengue, and St. Louis encephalitis viruses").

[6] A non-rebreather oxygen mask is "an oxygen administration device used to deliver high (greater than 60%) concentrations of oxygen.   The mask has one-way valves attached that allow expired gas exhalation out of the mask without allowing room air in to dilute expired oxygen.   A reservoir (bag) is attached to allow buildup of oxygen concentration." Mosby's Emergency Dictionary 236 (2d ed. 1998).

Judgment ¶¶ 13-14, at 4-5 (setting forth this fact); MSJ Response ¶ 8, at 4 (not controverting this fact).

When Memorial Medical admitted J. Davis in February, 2009, Memorial Medical had a policy regarding interpretive services for deaf patients.  See Motion for Summary Judgment ¶ 17, at 5 (setting forth this fact); MSJ Response ¶ 10, at 4 (not controverting this fact).  The Memorial Medical Center Administrative Policy and Procedure Manual, filed September 20, 2012 (Doc. 41-5)("Administrative Policy and Procedure Manual"), addressed the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and interpreter services.  Memorial Medical's Administrative Policy and Procedure Manual required that Memorial Medical provide deaf patients with auxiliary aids.  See Administrative Policy and Procedure Manual at 2; MSJ Response ¶ 39, at 8-9 (setting forth this fact); Reply at 4 (not controverting this fact).  Memorial Medical possessed "low-tech communication aides," including easy listening devices, communication boards, telecommunication devices for the deaf ("TDD"), a contact list of available area sign language interpreters, and televisions equipped with closed caption. Administrative Policy and Procedure Manual at 2.  See Motion for Summary Judgment ¶¶ 24-26, at 7 (setting forth this fact); MSJ Response ¶ 10, at 4 (not controverting this fact).  Furthermore, the Administrative Policy and Procedure Manual states: "Employees, including every staff member providing medical treatment or other services . . . to hearing impaired patients are responsible for ensuring compliance with this policy and for accessing appropriate interpreter services. . . ."  Administrative Policy and Procedure Manual at 2.  See MSJ Response ¶ 39, at 8-9 (setting forth this fact); Reply at 4 (not controverting this fact).    Memorial Medical's Administrative Policy and Procedure Manual indicated that the Administrator on Duty ("AOD") could "assist in communication with deaf persons by determining availability of local resources"

which included sign language interpreters, TDD aids, and low tech communication aids. Administrative Policy and Procedure Manual at 2.  See Motion for Summary Judgment ¶ 21, at 6-7 (setting forth this fact); Response ¶ 10, at 4 (not contravening this fact).

Memorial Medical's healthcare providers knew how to access interpreters for patients. See Motion for Summary Judgment ¶ 22, at 7 (setting forth this fact); MSJ Response ¶ 10, at 4 (not controverting this fact).  Memorial Medical staff knew about additional auxiliary aids for deaf patients.  See Surreply ¶ 6, at 3-4 (setting forth this fact).  Even though Memorial Medical healthcare providers knew about these resources, Memorial Medical healthcare providers never called a qualified sign language interpreter for J. Davis.  See MSJ Response ¶ 42, at 9 (setting forth this fact); Reply ¶ 15, at 4 (not controverting this fact).  J. Davis and Memorial Medical healthcare providers communicated, instead, through verbal communication, writing, and family members who were able to sign ASL with J. Davis throughout his February 2009 hospitalization. See Motion for Summary Judgment ¶¶ 18-19, at 6 (setting forth this fact); Response at 4 (not controverting this fact).

Memorial Medical healthcare providers were trained to generally assess patients' communication abilities.  See Surreply ¶ 6, at 3 (setting forth this fact).  Memorial Medical did not train AOD Ronald Wilson, R.N., however, in addressing deaf patients' needs specifically. See Response ¶ 47, at 10 (setting forth this fact); Reply at 5 (not controverting this fact).  As Memorial Medical's Patient Advocate, Julie Abrams acted as a liaison between healthcare providers, patients, and their families.  See Response ¶ 38, at 8 (setting forth this fact); Reply at 4 (not controverting this fact).  One of Abrams' responsibilities was promoting Memorial Medical's policies to its staff.  See Response ¶ 38, at 8 (setting forth this fact); Reply at 4 (not controverting this fact).  Abrams did not know what the term "auxiliary aids" meant, or know

whether Memorial Medical had a policy that measured deaf or hard-of-hearing patients'

communication abilities or needs.[7]

---

[7] B. Nordwall proposes the following as an undisputed fact: "Julia Abrams is not familiar with the term 'auxiliary aids'; a term which is used in MMC's policy addressing accommodation for the deaf.  Ms. Abrams does not know if MMC has a policy regarding how to exchange information successfully with a deaf patient."  MSJ Response ¶ 40, at 9.  In support, B. Nordwall directs the Court to Abrams' testimony:

Q. . . . Would you agree that if a patient is deaf, the hospital must provide auxiliary aids or services?

. . . .

[A.] Would you please describe auxiliary aids?

Q. Do you have an understanding of what may be encompassed by auxiliary aids for deaf or hard-of-hearing patients?

A. I'm not understanding the term.

Q. Okay.  So that's an unfamiliar term to you?

A.  Auxiliary aids?

Q. Yes, ma'am.

A. I don't understand that term.

Q. Okay.  Then let me rephrase.
Do you agree that the hospital must provide some type of service or device to assist a deaf patient?

. . . .

[A.] If it's their preference.

Deposition of Julia Abrams at 68:16-69:14 (taken August 29, 2012), filed November 19, 2012 (Doc. 47-6)(Ex. 6 to MSJ Response)("Abrams Depo.").  B. Nordwall proposes the following as undisputed fact: "Ms. Abrams didn't know if there was any policy in place to measure the communication abilities or needs of deaf or hard of hearing patients in 2009."  In support, B. Nordwall again points the Court to Abrams' testimony:

Q. . . .Was there any policy in place to measure the communication abilities or needs of deaf or hard-of-hearing patients in 2009?

Abrams did not have any training specifically dealing with deaf patients' communication needs.  See MSJ Response ¶ 47, at 10 (setting forth this fact); Reply at 5 (not controverting this fact).  Memorial Medical healthcare providers, nevertheless, continually assessed J. Davis during his stay, including J. Davis' communication ability.  See Surreply ¶ 5 at 3 (setting forth this fact).[8]  Some healthcare providers did not document communication issues when interacting with J. Davis, while other healthcare providers noted communication issues.[9]

_____

. . .

[A.] I don't know.

Abrams Depo. at 61:23-62:3.  Memorial Medical disputes this fact: "Ms. Abrams, a fact witness, did not recollect the term 'auxiliary aid,' but testified that the hospital in fact possessed technology to assist deaf individuals in the communication, as well as a list of interpreters for the same purpose."  Reply ¶ 13, at 4.  Memorial Medical, in support, directs the court to Abrams' testimony:

> Q. In 2009, February of 2009, to your knowledge, what services existed for deaf patients to communicate at the hospital?
>
> A. I believe we had the TDY phone.  There was a list of local interpreters.  And that's what I remember.

Abrams Depo. at 73:15-20.  The local rule requires a party to specifically controvert a fact to deem it in dispute.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  After a close reading of Abrams' deposition, the Court believes that Abrams was in fact unfamiliar with the term "auxiliary aids."  In particular, Abrams admitted she did not "understand that term."  Abrams Depo. at 69:6.  Therefore, the Court concludes that an accurate, and undisputed, fact is that Abrams was unfamiliar with the term "auxiliary aids."

Next, Memorial Medical has not "specifically controverted" B. Nordwall's allegation that Abrams' lacked knowledge regarding the policies governing deaf or hard-of-hearing patients' assessment.  D.N.M.LR-Civ. 56.1(b).  Rather, Memorial Medical points to Abrams' knowledge of auxiliary aids for deaf or hard-of-hearing patients, not the administrative policies governing Memorial Medical's assessment of those patients.  The Court, therefore, deems this fact admitted.

[8] B. Nordwall proposes the following as an undisputed fact: "MMC's two-page clinical documentation record in [J. Davis'] chart identifies his language as English and does not state that he was deaf or that he communicated with ASL, nor does it identify the need for auxiliary aids."  Response ¶ 24 at 5-6.  B. Nordwall directs the Court to a clinical form stating: "Language:

On February 9, 2009, because J. Davis repeatedly refused to wear his non-rebreather

oxygen mask and become combative with his healthcare providers, Memorial Medical healthcare

providers sedated and restrained J. Davis to prevent harm from oxygen deprivation.[10]   See MSJ

_____

English," filed on October 19, 2012 (Doc. 47-2).  Memorial Medical disputes this fact, stating: "While the two pages cited by Plaintiff indeed indicates that Mr. Davis could speak English, MMC did not ignore his hearing impairment.  Indeed, numerous other references in his medical records, including the emergency room visit that coincides with the two pages cited by Plaintiff, acknowledged his hearing impairment."  Reply ¶ 8, at 3.  In support, Memorial Medical directs the Court to healthcare provider notes: "PATIENT IS DEAF . . . PATIENT ABLE TO ANSWER QUESTION IN REASONABLE FASHION," filed on November 9, 2012 (Doc. 53-3)(emphasis in original).

     Memorial Medical's exhibit does not "specifically controvert[]" that the two-page clinical documentation identifies English, not ASL, as J. Davis' language, nor does it controvert that the two-page clinical documentation does not indicate a need for auxiliary aids.  D.N.M.LR-Civ. 56.1(b).  Rather, the Court accepts that the clinical documentation served as only one of many medical documents associated with J. Davis, where some noted J. Davis' deafness, and some did not.  The Court, therefore, concludes that an accurate, and undisputed, fact is that Memorial Medical healthcare providers assessed J. Davis throughout his stay, which included J. Davis' communication ability.

    [9] B. Nordwall proposes the following as an undisputed fact: "There are multiple notes in the treatment records referencing difficulty communicating with James Davis."  Response ¶ 43, at 9.  In support, B. Nordwall cites to a number of J. Davis' medical records.  See medical documentation, filed on October 19, 2012 (Doc. 47-7)(medical documentation noting that J. Davis' deafness caused communication issues); (Doc. 47-8)(same); (Doc. 47-10)(healthcare provider notes indicating communication with J. Davis was difficult  because of "language barrier" and that J. Davis communicated with sign language and no interpreter was at bedside).  Memorial Medical disputes this fact, stating: "Additionally, there are multiple notes in [J. Davis'] records indicating that the communication with him was effective, and that he understood without difficulty the information conveyed to him in writing or orally."  Reply ¶ 16, at 5. In support, Memorial Medical also refers the Court a number of J. Davis' medical records. See medical records filed November 9, 2012 (Doc. 53-3)(all medical documentation noting that, despite J. Davis' deafness, medical staff could communicate with him).   Notwithstanding   the several examples of J. Davis' ability to communicate without an interpreter, Memorial Medical's exhibits do not "specifically controvert[]" that other communication issues existed, but only support that, in some instances, communication issues between MMC healthcare professionals and J. Davis were successful.  D.N.M.LR-Civ. 56.1(b).  The Court, therefore, concludes that an accurate and undisputed fact is that some healthcare providers did not note communication issues when interacting with J. Davis, while other healthcare providers documented communication issues with J. Davis during his February 2009 admission at MMC.

    [10] S. Nordwall and Memorial Medical dispute the reason that Memorial Medical sedated and restrained J. Davis.  S. Nordwall asserts: "The reason given for restraint was that [J. Davis]

Response ¶ 30, at 6 (setting forth this fact); Reply ¶ 9, at 3 (not controverting this fact).   The

restraint lasted nine hours.   See Surreply ¶ 8, at 4 (setting forth this fact).   During J. Davis'

---

was 'not able to retain information or teaching regarding the danger of dislodging or removing medical equipment.'"   Response ¶ 30, at 6-7 (original alteration omitted).   In support, S. Nordwall refers to Physician's Orders (dated February 9, 2008) filed September 20, 2012 (Doc. 41-2).   The heading at the top of the Physician's Orders states: "Pre-Printed Medical OR Behavioral Restraint Orders" with a printed subheading that reads: "Medical Restraint." Physician's Orders at 1.  Under this subheading, a checked box reads: "Purpose: Not able to retain information or teaching regarding the danger of dislodging or removing medical equipment."  Physician's Orders.  Physician's Orders at 1.   B. Nordwall also proposes an additional, related fact that S. Davis, J. Davis' brother and an AOD at Memorial Medical, asserted that an "interpreter should have been involved in the process because [J. Davis] was refusing treatment and [Memorial Medical healthcare providers] should have explained it to him. . . . The hospital staff could have assumed the problems came from his communication problems, but instead they restrained and sedated him."  Supplemental Response ¶ 12, at 3-4.  In support, B. Nordwall directs the Court to S. Davis Depo. at 40:18-41:18 (stating that an interpreter could have explained to J. Davis why he was being restrained); S. Davis Depo. at 42:14-43:17 (stating that, because of his deafness, J. Davis' response to restraints might be misinterpreted as violence, and not frustration).

Memorial Medical disputes these facts: "Mr. Davis was restrained and sedated because he refused to utilize supplemental oxygen, became dangerously hypoxic when he did so, and was a danger to himself and others."  Reply ¶ 9, at 3.  See Stedman's Medical Dictionary, supra, at 939 (defining hypoxia as a "decrease below normal levels of oxygen in inspired gases, arterial blood, or tissue without reaching anoxia.").  In support, Memorial Medical directs the court to medical records, filed November 9, 2012 (Doc. 53-3)("Behavioral Restraint: Trying to hurt self by REMOVING OXYGEN MASK")(emphasis in original); healthcare provider notes filed November 9, 2012 (Doc. 53-3)(noting that the patient refused to use supplemental oxygen, that his oxygen saturations dropped when he declined, and that he would be "restrained for his medical safety").  Memorial Medical argues: "When not taking supplemental oxygen, Mr. Davis was a danger to himself, and his medical providers were concerned for his life."  Surreply ¶ 8, at 4-5. Deposition of Erika Sorrenson at 27:3-28:3 (taken November 29, 2012), filed February 4, 2013 (Doc. 62-2)("Sorrenson Depo.").  Both parties cite Memorial Medical records, but each party construes different meaning from the text, the Court finds Memorial Medical restrained J. Davis to prevent harm to J. Davis from oxygen deprivation.

Additionally, Memorial Medical disputes that an interpreter would have clarified the reasons for J. Davis' supplemental oxygen use.  See Surreply ¶ 8 at 4-5.  Memorial Medical states:

[T]he testimony by treating medical professionals in this case has been that Mr. Davis was at that time a danger to himself and others.  The medical records state that he was restrained because he refused to wear his oxygen mask and would become combative when he went without supplemental oxygen. . . .  He repeatedly refused to wear his supplemental oxygen mask, although he had been using oxygen for three years and was well aware of its importance.

- 13 -

restraint, Memorial Medical also sedated him to the point that Wilson and J. Davis' family members could not "arouse[]" J. Davis.  See MSJ Response ¶ 33, at 7 (setting forth this fact); Reply at 4 (not controverting this fact).    During J. Davis' sedation, he could not communicate.[11]

———————————————

Surreply ¶ 8 at 4-5.  In support, Memorial Medical cites to the record multiple times: Undisputed Material Facts 2, 3, and 4 to Motion for Summary Judgment ¶¶ 10-12, at 4-5 (stating that J. Davis required supplemental oxygen at all times for treatment of his illnesses, and life-threatening oxygen deprivation resulted when J. Davis refused to wear the non-rebreather mask); Undisputed Material Fact 5 to Motion for Summary Judgment ¶ 13, at 5 ("Throughout his treatment at Memorial Medical, Mr. Davis repeatedly resisted healthcare providers' attempts to treat him with supplemental oxygen, often becoming combative and removing his non-rebreather mask"); Undisputed Material Fact 6 to Motion for Summary Judgment ¶ 14, at 5 ("When Mr. Davis would remove his non-rebreather mask during his February 2009 admission to Memorial Medical, he exhibited signs of severe oxygen deprivation."); S. Davis Depo at 67:4-9, 68:3-24(stating that J. Davis used oxygen two to three years previous to his February 2009 MMC stay).

     B. Nordwall's reliance, however, on the Physician's Orders for the fact that J. Davis was restrained for communication issues is not supported by the documentation.  After carefully reading the supporting documentation, the Court finds that B. Nordwall's assertion that J. Davis was restrained because of communication issues relies on a standard, pre-printed medical form indicating only that a patient is "not able to retain information or teaching regarding the danger of dislodging or removing medical equipment."  Physician's Orders at 1.  There are no notes that indicate J. Davis' inability to "retain information or teaching" resulted from communication issues, nor did the treating physician handwrite any notes on the Physician's Orders to indicate communication issues lead to J. Davis' restraint and sedation.  Conversely, Memorial Medical relies on healthcare provider notes, which are not pre-printed but instead reflect observations of those healthcare providers, who indicate that J. Davis' restraint and sedation arose from his refusal to wear his oxygen mask.  These facts controvert B. Nordwall's allegation that communication issues with J. Davis led to his restraint and sedation.  The Court, therefore, concludes that an accurate and undisputed fact is that Memorial Medical restrained and sedated J. Davis, because he was combative, and not because of communication issues.

     [11] B. Nordwall proposes the following undisputed fact: "James could not communicate when MMC restrained him and his wrists were tied down."  MSJ Response ¶ 44, at 9.  In support, B. Nordwall cites her own testimony: "I know when they [Memorial Medical healthcare providers] tied him down, when they restrained him, that prevented him from even communicating."  B. Nordwall Depo. 141:17-23.  B. Nordwall also stated: "[J. Davis] had a right to say, 'I don't want that.'  Patients have a right to say I don't want something.  And you get them tied down, and you can't -- he can't say anything."  B. Nordwall 88:21-89:15.  For additional support, B. Nordwall points to Abrams' testimony:

Steve Davis, J. Davis' brother and an employee at MMC who was an AOD, reported to Wilson that B. Nordwall was upset about J. Davis' treatment.   <u>See</u> MSJ Response ¶ 32, at 7 (setting forth this fact); Reply at 3 (not controverting this fact).   <u>See also</u> Supplemental Response ¶ 12, at 3 (setting forth this fact); Surreply ¶ 8, at 4-5 (not controverting this fact).   B. Nordwall, S. Davis, and Wilson met on February 9, 2009.   <u>See</u> MSJ Response ¶ 33, at 7 (setting forth this fact); Reply ¶ 10, at 4 (not controverting this fact).   They developed a care plan that prohibited J. Davis' further sedation.   <u>See</u> MSJ Response ¶ 33, at 7 (setting forth this fact); Reply ¶ 10, at 4

_____

> Q.  (By Ms. Youngers)  Okay. If a patient who speaks -- who communicates with gestures and American Sign Language has their hands restrained, is it your belief that that would limit their ability to communicate?
>
> . . . .
>
> [A.] Restraints are used in emergency situations.  That I know.  So whoever made that decision made that decision that safety was priority.
>
> Q.  . . . Okay. I hear you. But that's a slightly different issue.
> What I'm asking you about is with a patient who is deaf and who uses American Sign Language and gestures to communicate, would restraining their hands limit their ability to communicate?
>
> . . . .
>
> [A.] Yes, that's possible.

Abrams Depo. at 88:21-89:15.  B. Nordwall asserts that, when Memorial Medical restrained J. Davis by tying down his hands, Memorial Medical took away J. Davis' ability to communicate, because J. Davis could not sign or gesture.  Memorial Medical disputes this fact: "[J. Davis'] own family acknowledged that he was able to communicate orally. . . . Mr. Davis lived in the hearing world without ever using an ASL interpreter.  Thus, even when restrained, Mr. Davis was not prevented from communicating."  Reply ¶ 17, at 5.  In support, Memorial Medical refers the Court to C. Nordwall's testimony, which indicated that J. Davis communicated verbally, through lip reading and writing in addition to sign language.  <u>See</u> C. Nordwall Depo. 23:24-25:3.  It is undisputed, however, that, during J. Davis' restraint, Memorial Medical also sedated him to the point that Wilson and J. Davis' family members could not "arouse[]" J. Davis.  <u>See</u> MSJ Response ¶ 33, at 7 (setting forth this fact); Reply at 4 (not controverting this fact).  The Court therefore concludes that an accurate, and undisputed, fact is that J. Davis could not communicate during the period he was restrained, because he was unconscious.

(not controverting this fact).   The plan also enlisted the family's help to communicate with J.

Davis.  <u>See</u> MSJ Response ¶ 33, at 9 (setting forth this fact).[12]   As a result of the meeting, Wilson

posted a list of the family members' contact information in J. Davis' chart and also above J.

Davis' bed.   <u>See</u> Motion for Summary Judgment ¶ 23, at 7 (setting forth this fact); MSJ

Response ¶ 33, at 7 (not controverting this fact).  Wilson instructed Memorial Medical healthcare

professionals to contact family members if they were needed to calm or interpret for J. Davis.

<u>See</u> Motion for Summary Judgment ¶ 24, at 7 (setting forth this fact); MSJ Response ¶ 10, at 4

(not controverting this fact).  <u>See also</u> Reply ¶ 15, at 4 (setting forth this fact).

Wilson sent an electronic mail transmission relaying J. Davis' family's concerns to

Abrams, Director of Nursing Ann DeBooy, and Risk Manager Dianne Gomez.   <u>See</u> MSJ

Response ¶ 37, at 8 (setting forth this fact); Reply at 4 (not controverting this fact).   In the

electronic mail transmission, Wilson stated:

> [A]fter speaking with Mrs. Nordwall we came up with a plan, we posted [J.
> Davis' family's] contact numbers on the wall next to the patients bed and on the
> patients chart with orders to call them anytime day or night for any concern, the
> patient is deaf . . . .   This morning I checked with Mrs. Nordwall and she said the
> plan did work, she was called and subsequently came in last night.

<u>See</u> Electronic Mail Message from Ronald Wilson to Julia Abrams (dated Feb. 10, 2009), filed

on October 19, 2012 (Doc. 47-3)("Davis Concern email").  On February 10, 2009, Dr. Sheer saw

J. Davis.  <u>See</u> MSJ Response ¶ 48, at 10 (setting forth this fact); Reply at 5 (not controverting

this fact).  J. Davis' deaf girlfriend translated using sign language.   <u>See</u> MSJ Response ¶ 48, at

10 (setting forth this fact); Reply at 5 (not controverting this fact).  During a consultation on

---

[12] Memorial Medical supplements this undisputed fact: "Involving family members to
help calm patients is common regardless of any communication handicaps they may have."
Reply ¶ 10, at 4.  Memorial Medical supports this supplementation by directing the Court to the
deposition of Ronald Wilson, R.N. at 73:25-74:20, 99:1-99:23 (taken August 29, 2012), filed
November 9, 2012 (Doc. 53-4)("Wilson Depo.")(stating that the hospital would have called the
family to assist if J. Davis became combative and that communication with J. Davis was
secondary, because Wilson believed communication had been effective).

February 10, 2009, Dr. Kevin Sheer noted that J. Davis was deaf and that "he could not answer questions on a variety of questions and he is unable to read lips."  Memorial Medical Center Consultation (dated Feb. 10, 2009), filed October 19, 2009 (Doc. 47-7).  See MSJ Response ¶ 48, at 10 (setting forth this fact); Reply at 5 (not controverting this fact).

J. Davis' doctor ordered the administration of Geodon to relieve J. Davis' anxiety.[13]  See Reply ¶ 11, at 4 (setting forth this fact); Supplemental Response at 1 (not controverting this fact). Despite the care plan that Wilson and J. Davis' family developed, the following evening, on February 10, 2009, a healthcare provider sedated J. Davis without contacting the J. Davis family. See MSJ Response ¶ 34, at 7 (setting forth this fact); Reply ¶ 11, at 4 (not controverting this fact).

After J. Davis' sedation, another meeting followed on February 11, 2009, to ensure adherence to the plan.[14]  See MSJ Response ¶ 35, at 7 (setting forth this fact); Reply ¶ 14, at 4

---

[13] Geodon is an antipsychotic agent.  See Physicians' Desk Reference  at 2601 (57th ed. 2003).

[14] While neither party disputes that a meeting occurred, each party cites a different reason for the meeting.  B. Nordwall implies that the family's complaints lead to second meeting: "The family complained that the plan had not been followed and again met with Ron Wilson."  MSJ Response ¶ 35, at 7-8.  Memorial Medical asserts, however, that it initiated the follow-up meeting:

> Plaintiff summarizes a lengthy meeting with hospital staff as one in which it "complained" of MMC's failure to follow an agreed upon treatment plan, omitting the fact that the meeting was a follow up on the part of the hospital to attempt to ensure Mr. Davis and his family were satisfied with the care he received.

See Reply ¶ 12, at 4.  Memorial Medical directs the Court to Wilson's Depo. at 67:22-68:13, which states that, after the initial meeting, he again met with J. Davis' family to discuss J. Davis' sedation on February 11, 2009.  Memorial Medical also cites to Memorial Medical correspondence (Doc. 53-5)(discussing the meetings with J. Davis' family).  See Grievance Follow-up Letter (dated February 18, 2009), filed September 20, 2012  (documenting the meeting between B. Nordwall and Wilson on February 11, 20109).  See also Electronic Mail

(not controverting this fact). J. Davis' family informed Wilson that federal law requires Memorial Medical to provide an interpreter. See MSJ Response ¶ 36 at 8 (setting forth this fact); Reply at 4 (not controverting this fact). Sandra Williams, from the New Mexico Commission for the Deaf, attended this meeting, and provided Wilson and Abrams a list of certified interpreters in the Las Cruces area.[15] See MSJ Response ¶ 41, at 9 (setting forth this fact); Reply ¶ 14, at 4 (not controverting this fact). After the meeting, Wilson posted a list of available area interpreters' contact information in J. Davis' chart and above J. Davis' bed. See Motion for Summary Judgment ¶ 23, at 7 (setting forth this fact); MSJ Response ¶ 33, at 7 (not controverting this fact). Wilson instructed J. Davis' family and Memorial Medical healthcare providers to call an interpreter if needed. See Motion for Summary Judgment ¶ 24, at 7 (setting forth this fact); MSJ Response ¶ 10, at 4 (not controverting this fact). See also Reply ¶ 10, at 4 (setting forth this fact). Despite these instructions, Memorial Medical administrators, MMC

_____

Messages between Gomez, Wilson, Abrams, and Debooy (dated Feb. 10-11, 2009), filed on November 9, 2012 (Doc. 53-5)(discussing the administrative procedures for bringing a contract interpreter to Memorial Medical for J. Davis). After carefully reading the supporting documentation, the Court finds that none of the documentation establishes who initiated the meeting. The electronic mail transmission from Wilson to Abrams indicates that Wilson checked back with B. Nordwall after the first meeting, but the record is unclear if this contact is the second meeting to which the parties refer. See Electronic Mail Message (Doc. 53-5)(Wilson)("This morning I checked back with Mrs. Nordwall and she said the plan did work."). The remaining documents reference a meeting which took place after Wilson checked with B. Nordwall, but none of the documents clearly state who initiated the meeting. The Court thus finds in dispute who was responsible for the second meeting.


[15] B. Nordwall asserts that Diane Gomez was in attendance at this meeting. See MSJ Response ¶ 42, at 9. Memorial Medical acknowledges the meeting took place, but disputes Gomez' presence. See Reply ¶ 14, at 4 (not controverting this fact). In support, Memorial Medical refers the Court to the Affidavit of Dianne Gomez (taken November 9, 2012) filed November 9, 2012 (Doc. 53-7)("D. Gomez Aff.")(stating that D. Gomez did not attend the meeting). The local rules require a party to specifically controvert a fact to deem the fact in dispute. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). Memorial Medical "specifically controvert[s]" B. Nordwall's allegation that D. Gomez was present at the second meeting between B. Nordwall, S. Nordwall, and Wilson. The Court, therefore, finds this fact in dispute.

healthcare providers, J. Davis, and his family called an interpreter during J. Davis' stay.  See MSJ Response ¶ 42, at 9 (setting forth this fact); Reply ¶ 15, at 4 (not controverting this fact).

Abrams mailed B. Nordwall a Grievance Follow-Up Letter that reaffirmed the list of interpreters posted above J. Davis' bed and in his chart.  See Grievance Follow-up Letter at ¶ 6 at 1 (dated February 18, 2009), filed September 20, 2012 (Doc. 41-8); MSJ Response ¶ 46, at 10 (setting forth this fact); Reply at 5 (not controverting this fact).  The Grievance Follow-up Letter indicates that "the nurses were instructed to contact the interpreters as needed to ensure that James' primary communication preferences were met."  Grievance Follow-up Letter ¶ 6 at 1. See MSJ Response ¶ 46, at 10; (setting forth this fact); Reply at 5 (not controverting this fact).

S. Davis could sign English, but not ASL.  See Supplemental Response ¶ 8 at 3 (setting forth this fact); Surreply at 3 (not controverting this fact).  During J. Davis' February, 2009 stay at Memorial Medical, J. Davis communicated to S. Davis:  "I need sign language.  I need to" -- "I don't understand. I need sign language."  S. Davis Depo. at 48:21-23.  S. Davis stated: "I know this is 'sign,' and that's 'need,' but I don't know if that was what he was saying, 'Need sign language.'"  S. Davis Depo. at 49:1-3.  S. Davis assumed J. Davis was asking for an interpreter.  S. Davis Depo. at 49:3-6.[16]  At some point during J. Davis' admission to Memorial

---

[16] B. Nordwall proposes the following as undisputed fact: "While in the hospital, James Davis communicated that he needed sign language and that he didn't understand." Supplemental Response ¶ 13, at 4.  In support, B. Nordwall cites to S. Davis Depo. at 48:15-49:9 (stating that S. Davis believed J. Davis requested a sign language interpreter).  Memorial Medical disputes the fact's admissibility, asserting that J. Davis' request for an interpreter is "based entirely on hearsay testimony by Steve Davis," and that B. Nordwall cannot cite another instance where J. Davis asked for an interpreter.  Surreply ¶ 9, at 6.  In support, Memorial Medical refers the Court to B. Nordwall's Depo. at 174:5-20 (stating that J. Davis may have used an ASL interpreter only once during a criminal proceeding, but otherwise interacted without an ASL interpreter in the hearing world).  Memorial Medical's exhibits do not "specifically controvert[]" that the request was made, but rather assert that B. Nordwall's proposed fact is inadmissible.

In a motion for summary judgment, a court can rely on evidence that, as submitted in the motion, would be inadmissible at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324

(1986)(holding that a non-movant need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment").  The Tenth Circuit has held, however, that a court can rely on evidence that is in an inadmissible form only if it finds the evidence will be presented in an admissible form at trial.  See Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006)("[P]arties may submit affidavits even though affidavits are often inadmissible hearsay at trial on the theory that the same facts may ultimately be presented at trial in an admissible form.")(citing Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005)).

It is true that "[h]earsay testimony is generally inadmissible."  Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *13 (D.N.M. Jan. 18, 2013)(Browning, J.)(citing Fed. R. Evid.802).   Under rule 801(c) of the Federal Rules of Evidence, "[h]earsay means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  It is equally true, however, that "testimony is not hearsay when i[t] is [offered] to prove only that a statement was made and not the truth of the statement."  Creaghe v. Iowa Home Mut. Cas. Co., 323 F.2d 981, 984 (10th Cir. 1963)(citing Aikins v. United States, 282 F.2d 53 (10th Cir. 1960)).  Statements offered not to prove the truth of the statements, but rather "offered for the effect on the listener [] are generally not hearsay."  Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993).  See United States v. Smalls, 605 F.3d 765, 785 n.18 (10th Cir.2010)("[S]tatements offered for their effect on the listener are not hearsay.").  Thus, statements offered to show that the listener was on notice of a fact are not hearsay.  See Thornburg v. Mullin, 422 F.3d 1113, 1128 (10th Cir. 2004)("The statements were probably offered just to complete the narrative, and at most were offered to show that Thornburg was on notice that Anderson was intent on committing violence -- a use that is independent of the truth of the statement of intent and thus is not hearsay.").  "Legally operative statements [--] statements have legal effect by the mere fact of their statement [--] . . . are generally not for the 'truth of the matter asserted,' but rather to show the fact of the statement being made and for the effect of the statement on the hearer."  Barner v. City of Harvey, 95 C 3316, 1998 WL 664951, at *2 (N.D. Ill. Sept. 18, 1998).

Memorial Medical objects to B. Nordwall's proposed fact that J. Davis communicated that he needed sign language to understand, because the statement B. Nordwall proposes is inadmissible hearsay.  See Surreply ¶ 9, at 6.   S. Davis' testimony about J. Davis' communication, which J. Davis did not "make while testifying at the current trial or hearing," meets the hearsay definition's first prong.  Fed. R. Evid. 801(c)(1).  This statement fails the second prong of the test, however, because it is not offered to "prove the truth of the matter asserted."  Fed. R. Evid.801(c)(2).  B. Nordwall offers S. Davis' testimony to show only that J. Davis requested sign language communication, not to "prove the truth" that J. Davis required sign language communication.  Fed. R. Evid.801(c)(emphasis added).  The Court concludes that, to the extent B. Nordwall offers S. Davis' testimony for the non-hearsay purpose to show that J. Davis communicated that he needed sign language, this proposed fact is offered to "to show the fact of the statement being made and for the effect of the statement on the hearer."  Skyline Potato Co., Inc. v. Hi–Land Potato Co., Inc., 2013 WL 311846, at *19 (original alterations omitted) (quoting Barner v. City of Harvey, 95 C 3316, 1998 WL 664951, at *2 (N.D. Ill. Sept. 18, 1998))(internal quotations omitted).

The Court, therefore, for purposes of the Motion for Summary Judgment, will consider S. Davis' Depo. only to the extent that J. Davis communicated he needed sign language to understand.  Next, because Memorial Medical does not "specifically controvert" B. Nordwall's

Medical, B. Nordwall and S. Davis "took over" J. Davis' medical decision-making. Supplemental Response ¶ 11, at 3 (setting forth this fact); Surreply ¶ 7, at 4 (not controverting this fact).

Despite Memorial Medical's administrative policy, the available resources for deaf patients, and meetings with J. Davis' family, Memorial Medical did not use an interpreter or TDY to communicate with J. Davis. See Supplemental Response ¶ 4, at 2 (setting forth this fact); Surreply at 4 (not controverting this fact). Memorial Medical discharged J. Davis on February 23, 2009. See MSJ Response ¶ 23, at 5 (setting forth this fact); Reply at 3 (not controverting this fact). J. Davis did not want to return to Memorial Medical for treatment.[17]

---

proposed fact, the Court concludes that an accurate and undisputed fact is that J. Davis communicated to S. Davis that he needed sign language to understand.

[17] B. Nordwall proposed the following as undisputed fact: "James Davis' inability to communicate with his healthcare providers negatively impacted the care he received" and that J. Davis "misunderstood and misinterpreted communications" with this healthcare providers. Supplemental Response ¶ 14, at 4. In support, B. Nordwall cites to S. Davis Depo. at 50:21-25 (agreeing that the inability for J. Davis to communicate with doctors and staff negatively affected J. Davis' care); S. Davis Depo. at 64:8-65:20 (stating that a nurse's attempt at communication with J. Davis "got lost in translation" so that J. Davis understood her to say Memorial Medical was "trying to kill him."). Memorial Medical disputes both facts as "pure speculation and hearsay." Surreply ¶ 10, at 6.

S. Davis' testimony about J. Davis' communication with Memorial Medical healthcare providers meets the hearsay definition's first prong because S. Davis did not this statement "while testifying at the current trial or hearing." Fed. R. Evid. 801(c)(1). This statement also meets the second prong of the test, because it is offered to "prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). B. Nordwall offers S. Davis' testimony to "prove the truth" that J. Davis "misunderstood and misinterpreted communication" between him and his healthcare providers. Fed. R. Evid. 801(c). The Court concludes that B. Nordwall does not offer S. Davis' testimony for any non-hearsay purpose such as "to show the fact of the statement being made and for the effect of the statement on the hearer," Skyline Potato Co., Inc. v. Hi–Land Potato Co., Inc., 2013 WL 311846, at *19, but instead to "prove the truth." That is, without an interpreter, J. Davis "misunderstood and misinterpreted" communications. Fed. R. Evid. 801(c)(2). Supplemental Response ¶ 14, at 4. This evidence is not likely to be in an admissible form at trial. The Court, therefore, for purposes of the Motion for Summary Judgment, will not consider S. Davis' Depo. to the extent that, absent an interpreter, J. Davis "misunderstood and misinterpreted" communications with his healthcare provider.

<u>See</u> Supplemental Response ¶ 15, at 4 (setting forth this fact); Surreply at 6 (not controverting

this fact).  J. Davis died at his home on March 26, 2009.  <u>See</u> Complaint ¶ 47, at 7 (setting forth

this fact).

## PROCEDURAL BACKGROUND

B. Nordwall filed her First Amended Complaint for ADA and Rehabilitation Act claims,

the New Mexico Wrongful Death Act, and the New Mexico Unfair Trade Practices Act in the

Third Judicial District Court for the State of New Mexico on March 23, 2012, bringing suit

against Memorial Medical (Doc. 1-1)("Amended Complaint").  In the Amended Complaint, B.

Nordwall alleged five counts against Memorial Medical, including: Count I -- Discrimination on

the Basis of a Disability in Violation of Title III of the ADA, 42 U.S.C. §§ 12182-12189; Count

II -- Discrimination on the Basis of a Disability in Violation of the Rehabilitation Act, 29 U.S.C.

§ 794; Count III -- Negligence Resulting in Harm and Wrongful Death; Count IV -- Negligent

Training and Supervision; and Count V -- Violation of New Mexico Unfair Trade Practices Act,

NMSA 1978, § 57-12-1.  <u>See</u> Amended Complaint at 6-15.  On April 24, 2012, Memorial

---

In addition, Memorial Medical asserts that B. Nordwall offers no testimony that J. Davis' care or treatment was "affected in any substantive way by lack of an interpreter."  Surreply ¶ 10, at 6.  "Parties may 'show[ ] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'"  <u>San Cristobal Acad., Inc. v. Transitional Living Corp.</u>, CIV. 10-1152 JH/WDS, 2012 WL 6605992 at *5 (D.N.M. July 13, 2012)(Herrera, J.)(citing Fed. R. Civ. P. 56(c)(1)(B)).  The Court cannot properly consider S. Davis' hearsay testimony.  While B. Nordwall has set forth undisputed facts that interpreters can be useful for deaf patients in general, B. Nordwall has not cited to any additional any evidence on the record that supports her assertion that <u>J. Davis'</u> care was affected by the absence of an interpreter.  <u>See</u> Supplemental Response ¶ 10, at 3 (asserting that interpreters are often necessary in a deaf patient's care).  B. Nordwall, therefore, has not provided any evidence to support her assertion that J. Davis' care was affected by the absence of an interpreter.

Medical removed the case to federal court and demanded a jury trial.  See Notice of Removal of

Defendant PCH-Las Cruces, Inc. d/b/a Memorial Medical Center and Demand for Jury Trial at 1

(Doc. 1).   Memorial Medical, on May 1, 2012, filed their Motion to Dismiss Plaintiff's

Americans with Disabilities Act Claim Pursuant to Federal Rule of Civil Procedure 12(B)(6) and

a Motion to Dismiss Plaintiff's Unfair Trade Practice Act Claim Pursuant to Federal Rule of

Civil Procedure 12(B)(6).  See Motion to Dismiss Plaintiff's Americans with Disabilities Act

Claim (Doc. 6); Motion to Dismiss Plaintiff's Unfair Trade Practice Act Claim (Doc. 7).   On

May 31, 2012, B. Nordwall and Memorial Medical filed a Stipulated Dismissal (Doc. 22),

agreeing to dismiss Count I with prejudice and Count V without prejudice.   See Stipulated

Dismissal 1-2.  This case was assigned to the Court on May 18, 2012.  See Notice (Doc. 14).

On September 20, 2012, Memorial Medical filed its Motion for Summary Judgment

requesting that the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, enter

partial summary judgment in its favor on B. Nordwall's Rehabilitation Act claim.  To support its

argument in favor of summary judgment, Memorial Medical argues that B. Nordwall's claim

fails because a Rehabilitation Act claim does not survive a disabled claimant's death.   See

Motion for Summary Judgment at 14.  Memorial Medical acknowledges that ordinarily, "[t]he

question of survival of an action grounded in federal law is governed by federal common law

when .  .  . there is no expression of contrary intent."   Motion for Summary Judgment at 14

(citing Smith v. Dep't. of Human Servs., 876 F.2d 832, 834 (10th Cir. 1989)(internal citations

omitted)).  Memorial Medical argues in the absence of such a provision in civil rights cases, that

"federal law will incorporate the appropriate state law unless that law 'is inconsistent with the

Constitution and laws of the United States.'"   Motion for Summary Judgment at 14 (citing

Bennett v. Tucker, 827 F.2d 63, 67 (7th Cir. 1987)(quoting 42 U.S.C. § 1988)).   Memorial

- 23 -

Medical argues that, absent a federal civil rights law's express provision for a claim surviving the claimant's death, state law can cause abatement of the federal claim.   See Motion for Summary Judgment at 14 (citing Robertson v. Wegmann, 436 U.S. at 590).

Memorial Medical asserts that, because the Rehabilitation Act does not contain any provision regarding the survival of a deceased individual's claim, it is appropriate to look to New Mexico law to answer the question of survivability.   See Motion for Summary Judgment at 14. Memorial Medical argues that New Mexico law provides survival in limited causes of actions at common law, including mesne profits, an injury to real or personal estate, deceit or fraud, and wrongful death.   See Motion for Summary Judgment at 15 (citing N.M.S.A 1978 § 37-2-1.) Memorial Medical asserts that New Mexico law provides neither explicitly nor implicitly for the survival of a Rehabilitation Act claim.   See Motion for Summary Judgment at 15.   Memorial Medical argues that a Rehabilitation Act claim is neither a personal injury claim nor a wrongful death claim.[18]   Memorial Medical argues that because New Mexico statute does not provide survival of B. Nordwall's Rehabilitation Act claim, it may not survive J. Davis' death.

In addition, Memorial Medical asserts that, at common law, New Mexico allows causes of action for negligence to survive because damages for negligence are intended to be compensatory.   See Motion for Summary Judgment at 16 (citing Rodgers v. Ferguson, 89 N.M. 688, 556, P.2d 844 (N.M. Ct. App. 1976)).   Memorial Medical contrasts this causes of actions for

---

[18] Memorial Medical, in a footnote, states:

To the extent Plaintiff claims her Rehabilitation Act cause of action sounds in personal injury or wrongful death, Plaintiff's claims are precluded under New Mexico's prohibition on double recovery.   See Hale v. Basin Motor Co., 110 N.M. 314, 320, 795 P.2d 1006, 1012 (N.M. 1990).   Indeed, it is important to note that Memorial Medical is not seeking at this time to prevent Plaintiff from pursuing her personal injury and wrongful death claims.

Motion for Summary Judgment at 15 n.6.

intentional torts under New Mexico common law, which do not survive, because the damages are intended to be punitive.  See Motion for Summary Judgment at 16 (citing Oliveros v. Mitchell, 449 F.3d 1091, 1094-95 (10th Cir. 2006)).   Memorial Medical argues that because the Rehabilitation Act standard of proof requires a showing of intentional discrimination, a plaintiff must "show the statutory equivalent of an intentional tort in order to recover."   Motion for Summary Judgment at 16.   Memorial Medical argues that, after applying the Tenth Circuit's holding that intentional torts do not survive the claimant's death, B. Nordwall's Rehabilitation Act claim should not survive J. Davis' death.  See Motion for Summary Judgment at 16-17 (citing Oliveros v. Mitchell, 449 F.3d at 1094-95).

Additionally, Memorial Medical argues that no dispute of material fact exists to demonstrate Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.  See Motion for Summary Judgment at 12.  Memorial Medical argues that, in the Rehabilitation Act context, deliberate indifference means that "the policy maker must have acted with 'at least deliberate indifference to the strong likelihood [of] a violation of federally protected rights . . . from the implementation of the [challenged] policy . . . [or] custom.'" Motion for Summary Judgment at 10 (citing Bartlett v. N.Y. State Bd. of Law Examiners, 156 F.3d 321, 331 (2d Cir. 1998))(internal quotations and citations omitted, brackets in original). Memorial Medical argues that, even though B. Nordwall requested a sign language interpreter for J. Davis, deliberate indifference to J. Davis' rights under the Rehabilitation Act requires more than a hospital's failure to provide a sign language interpreter.   See Motion for Summary Judgment at 10.  Memorial Medical maintains that its policies, auxiliary aids, and meetings with J. Davis' family preclude finding that Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.  See Motion for Summary Judgment at 12.  Memorial

Medical relies on an unpublished opinion from the United States Court of Appeals for the Eleventh Circuit and from the United States Court of Appeals for the Second Circuit where the courts found the defendant hospitals did not act with deliberate indifference to deaf patients' rights under the Rehabilitation Act.  First, in Saltzman v. Board of Commissioners of the North Broward Hospital District, 239 F. App'x 484 (11th Cir. 2007)(per curiam), the court granted summary judgment on a Rehabilitation Act claim when the hospital had a policy and auxiliary aids in place, but, despite the patient and his family's multiple requests, the hospital failed to secure an interpreter.  See 239 F. App'x at 485.  In Freydel v. New York Hospital, 242 F.3d 365, 2000 WL 1836755 (2d Cir. 2000)(unpublished table decision), the court granted summary judgment after finding the hospital did not act with deliberate indifference to the deaf patient's Rehabilitation Act rights, even though the deaf patient's family filed suit for injunctive relief before the hospital provided the patient a Russian sign language interpreter.  See 2000 WL 1836755 at *4.

Memorial Medical argues that this case is similar to Saltzman v. Board of Commissioners of the North Broward Hospital District and Freydel v. New York Hospital, and relies on the proposition that hospitals with a policy, procedure, and auxiliary aids for deaf patients do not act with deliberate indifference to a patient's Rehabilitation Act rights even when the hospital imperfectly accommodates a deaf patient.  See Motion for Summary Judgment at 11.  Memorial Medical argues that, like each of those hospitals, it too had a policy and auxiliary aids for deaf patients.  See Motion for Summary Judgment at 12-13.  Memorial Medical argues that it followed its policy when it provided J. Davis with access to interpreter contact information, and a pen and paper to communicate, and instructed both healthcare providers and family members to call an interpreter if needed.  See Motion for Summary Judgment at 13.  Memorial Medical

asserts that it had taken "significant steps to provide communication resources to deaf and hard of hearing patients" well before J. Davis' family lodged any complaints about interpreter availability.   Motion for Summary Judgment at 13.   Memorial Medical argues that, even if it failed to execute its policy perfectly, like the defendant hospitals in Saltzman v. Board of Commissioners of the North Broward Hospital District and Freydel v. New York Hospital, such failure does not rise to the level of deliberate indifference to a patients' Rehabilitation Act rights.

B.  Nordwall filed her Response to the Motion for Summary Judgment on November 9, 2012, asking the Court to deny Memorial Medical's Motion for Summary Judgment.  See MSJ Response at 2.  B. Nordwall argues that a Rehabilitation Act claim survives a disabled claimant's death.  See MSJ Response at 2.   B. Nordwall asserts that a Rehabilitation Act claim is not equivalent to an intentional tort.   See MSJ Response at 2 (citing Oliveros v. Mitchell, 449 F.3d at 1094-95).  B. Nordwall asserts that Memorial Medical incorrectly equates a Rehabilitation Act claim and a § 1983 excessive force claim.  See MSJ Response at 2.  B. Nordwall argues that the Rehabilitation Act is "more remedial than penal in nature."  MSJ Response at 2.  B. Nordwall asserts that  neither New Mexico law nor the Tenth Circuit preclude a claim under the Rehabilitation Act, brought by a personal representative after a claimant's death.  See MSJ Response at 2-3.  B. Nordwall argues that Memorial Medical "gets a free pass" and "benefits from [J. Davis'] death" if the Rehabilitation Act claim does not survive J. Davis' death.  Motion for Summary Judgment at 19.  B. Nordwall turns to ADA claims in support of her contention, pointing out that courts analyze ADA claims like personal injury claims and look to state survival statutes to determine whether such claims survive a claimant's death.  See MSJ Response at 20 (citing Allred v. Solaray, Inc., 971 F. Supp. 1394, 1397 (D. Utah 1997); Soigner v. Am. Bd. of Plastic Surgery, 92 F.3d 547 (7th Cir. 1996).  In addition, B. Nordwall states that

in <u>Wagner v. Tex. A & M Univ.</u>, 939 F. Supp. 1297, 1311 (S.D. Tex. 1996), the United States District Court for the Southern District of Texas found that "the most appropriate statute of limitations to borrow for § 504 of the Rehabilitation Act of 1973 is the one 'governing personal injury suits.'" (internal citations omitted).   MSJ Response at 20.   B. Nordwall argues that applying the <u>Wagner v. Texas A & M University</u> analysis "leads to the conclusion that the Rehabilitation Claim survives because personal injury claims survive under New Mexico's survival statute, N.M. Stat. Ann. § 37-2-1."  MSJ Response at 20.

Next, B. Nordwall counters Memorial Medical's argument that B. Nordwall failed to allege a personal injury claim.  <u>See</u> MSJ Response at 20.  B. Nordwall asserts that reasonable jurors could see Memorial Medical's sedation and restraint of J. Davis as causing physical and emotional pain as a personal injury claim basis.  <u>See</u> MSJ Response at 20-21.  B. Nordwall asserts that a personal representative may pursue claims for pain and suffering that precede a claimant's death.  <u>See</u> MSJ Response at 21 (citing <u>Stang v. Hertz Corp.</u>, 81 N.M. 69, 77, 463 P.2d 45, 53 (1969)).

B. Nordwall points out that Memorial Medical does not dispute that B. Nordwall meets the elements of a prima facie claim of discrimination under the Rehabilitation Act.  <u>See</u> MSJ Response at 13.  B. Nordwall contends that there is a genuine issue of material fact whether Memorial Medical acted, contrary to the Rehabilitation Act's provisions, with deliberate indifference toward J. Davis' rights under the Rehabilitation Act.  <u>See</u> MSJ Response at 13.  B. Nordwall argues that 45 C.F.R. § 84.52(d) defines Memorial Medical's Rehabilitation Act obligations, providing that certain healthcare providers who receive federal funding "shall provide appropriate auxiliary aids to persons with impaired sensory, manual or speaking skills where necessary to afford such persons an equal opportunity to benefit from the service" and

also that such auxiliary aids "may include brailled and taped material, interpreters and other aids for person with impaired hearing or vision."   MSJ Response at 14 (quoting 45 C.F.R. § 84.52(d))(internal quotations omitted).   B. Nordwall contends that, despite these federal requirements and the requests of J. Davis' family, Memorial Medical administrators did not adequately implement the policy or make auxiliary aids available to J. Davis during his hospitalization.   See MSJ Response at 16.   B. Nordwall argues that Memorial Medical was "required" to provide these aids.  See MSJ Response at 14 (emphasis in original).

B. Nordwall argues that Memorial Medical's reliance on J. Davis' family and girlfriend to serve as interpreters, instead of securing a certified ASL interpreter, demonstrates that Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.  See MSJ Response at 15.  B. Nordwall relies on Ulibarri v. City and County of Denver, 742 F. Supp. 2d 1192 (D. Colo. 2010), for the proposition that intentional discrimination for the purposes of the Rehabilitation Act can occur if a deaf individual does not have the same opportunity to access services.  See MSJ Response at 17.  The United States District Court of Colorado dismissed multiple claims, but let survive a claim alleging that, during the plaintiff's detainment, because an issue of fact existed whether the deaf detainee was denied equal access to jail services as a result of inadequate detention center staff training, a jury might define as "gaps in the deputies knowledge of how best to communicate with deaf inmates as well as how and under what circumstances to obtain an interpreter."  MSJ Response at 17 (quoting Ulibarri v. City and Cnty. of Denver, 742 F. Supp. 2d at 1217).  B. Nordwall cites to four additional cases, although she does not discuss these cases: Salinas v. City of New Braunfels, 557 F. Supp. 2d 777 (W.D. Tex. 2008); Davis v. Flexman, 109 F. Supp. 2d 776 (S.D. Ohio 1999); Mayberry v. Von

Valtier, 843 F. Supp. 1160 (E.D. Mich. 1994); McCollum v. Orlando Regional Healthcare Syst., Inc., 2012 WL 207025 (M.D. Fla. 2012).  MSJ Response at 17.

Memorial Medical filed its Reply on November 9, 2012.  Memorial Medical in its Reply reiterates that, in Oliveros v. Mitchell, the Tenth Circuit held that intentional torts do not survive a claimant's death.  See Reply at 9 (citing Oliveros v. Mitchell, 449 F.3d at 1091).  Memorial Medical asserts that B. Nordwall fails to cite a single federal case holding that Rehabilitation Act claims do survive a claimant's death.  See Reply at 9.  Memorial Medical returns to the Tenth Circuit's reasoning of Oliveros v. Mitchell, where the Tenth Circuit held that § 1983 claims are necessarily premised on a defendant's intentional act, and those claims do not survive a claimant's death.  See Reply at 10 (citing Oliveros v. Mitchell, 449 F.3d at 1095).  Memorial Medical argues that B. Nordwall's position is incongruent when she argues -- despite the intentional discrimination standard for Rehabilitation Act claims -- that a Rehabilitation Act claim is not akin to an intentional tort.  See Reply at 9.  Memorial Medical argues that the reasoning in Oliveros v. Mitchell should apply here, so that Rehabilitation Act claims do not survive a disabled claimant's death.  See Reply at 10.

In addition, Memorial Medical disputes B. Nordwall's interpretation of the cases she cites in support of her position.  See Reply at 11.  Memorial Medical argues that Soigner v. American Board of Plastic Surgery is not on point, because it does not deal with survival of claims, but deals with the ADA's statute of limitations.  See Reply at 11 (citing to Soigner v. Am. Bd. of Plastic Surgery, 92 F.3d at 550-51.))  Memorial Medical asserts that B. Nordwall's reliance on Wagner v. Texas A & M University for the proposition that personal injury statutes should govern Rehabilitation Act claims is "simply wrong."  Reply at 11.  Memorial Medical argues that Allred v. Solaray, Inc., Soigner v. American Board of Plastic Surgery, and Wagner v. Texas

A & M University do not deal with Rehabilitation Act claims or survival of those claims.  See Reply at 11.

Memorial Medical also argues that Wilson v. Garcia establishes only a uniform statute of limitations for civil rights claims, not that all civil rights claims are to be treated like personal injury claims.  See Reply at 11-12 (citing Wilson v. Garcia, 471 U.S. 261 (1985)).  Memorial Medical argues that, in Wilson v. Garcia, the Supreme Court of the United States held that courts examining § 1983 claims should use state statute of limitations for personal injury actions.  See Reply at 11. It points out that the Tenth Circuit decided Oliveros v. Mitchell after Wilson v. Garcia, and held that intentional torts do not survive a claimant's death under New Mexico law. See Reply at 11.  Memorial Medical asserts that the Tenth Circuit's holding in Oliveros v. Mitchell, in light of Wilson v. Garcia's existence, demonstrates that courts should not treat all civil rights cases like personal injury cases.  See Reply at 12.

Memorial Medical asserts that B. Nordwall "seems to confuse" the Rehabilitation Act's standard, intentional discrimination, with negligence or that "communications with J. Davis were effective."  Reply at 1.  Memorial Medical also argues that  Salinas v. City of New Braunfels is not on point, because that case involved a defendant who refused to provide interpretative services, whereas Memorial Medical never denied interpretive services.  See Reply at 6. Similarly, Memorial Medical argues that, in Davis v. Flexman, there was no issue of deliberate indifference to a deaf person's Rehabilitation Act rights and so the case is "inapplicable."  Reply at 6.  Next, Memorial Medical asserts that  Mayberry v. Von Valtier focused on whether enough evidence existed that the plaintiff was denied an interpreter for future medical treatment, which is not the issue in B. Nordwall's claim.  See Reply at 7.  And in response to B. Nordwall's cite to McCollum v. Orlando Regional Healthcare System, Inc., Memorial Medical argues that the

12(b)(6) motion, which rests solely on the complaint, is not an appropriate comparison to a motion for summary judgment.  See Reply at 7-8.  Finally, Memorial Medical argues that B. Nordwall fails to demonstrate that it acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.

On November 28, 2012, the Court held a hearing on the Motion for Summary Judgment. Memorial Medical acknowledged that the Rehabilitation Act does not address whether claims survive a deceased claimant.  See Transcript of Hearing at 51:19-23 (taken November 28, 2012)(Oertle)("Tr.").[19]   In addition, Memorial Medical conceded that there is no clear New Mexico or Tenth Circuit case law addressing a Rehabilitation Act claim's survivability.  See Tr. at 51:8-10 (Oertle).   Memorial Medical asserted that the Supreme Court precedent dictates that absent any conflict with congressional intent, the state law controls survivability.  See Tr. at 51:23-52:5 (Oertle).  In addition, Memorial Medical argued that New Mexico case law clearly indicates that "intentional tort claims would not survive under New Mexico survival statutes even to the extent that the survival statutes otherwise allow personal injury actions to survive the death of the would-be plaintiff."  Tr. at 51:11-18 (Oertle).  Memorial Medical argued that, for B. Nordwall to prove her case, she must prove intentional discrimination, which Memorial Medical argues is like an intentional tort.  See Tr. at 53:23-54:17.  Memorial Medical asserted that Oliveros v. Mitchell's holding is analogous to intentional discrimination in Rehabilitation Act claims, and that claims should therefore also not survive.  See Tr. at 53:7-22.

The Court asked whether Title VII claims and ADA claims survive the claimant's death in New Mexico or the Tenth Circuit.  See Tr. at 55:8-10 (Court).  Memorial Medical answered that it did not find any Tenth Circuit law addressing that issue.  See Tr. at 55:11-12 (Oertle).

---

[19]  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Memorial Medical, however, answered that Allred v. Solaray, Inc., a case arising in the District Court of Utah, concluded that ADA claims cannot survive unless there is a need for injunctive relief.  See Tr. at 55:12-20 (Oertle).

B.  Nordwall argued that Oliveros v. Mitchell is not on point.  See Tr. at 56:5-6 (Youngers).  B. Nordwall argued that the holding in Oliveros v. Mitchell is limited to excessive use of force, which B. Nordwall concedes is an intentional tort, but that excessive use of force and discrimination are not sufficiently analogous for the Oliveros v. Mitchell precedent to apply here and to extinguish the Rehabilitation Act claim.  See Tr. at 56:7-17 (Youngers).  B. Nordwall argued instead that, because the Rehabilitation Act is silent on survivability, it is appropriate to turn to state law to determine survivability.  See Tr. at 56:18-22 (Youngers).  She asserted that both New Mexico's survivor statute and Stang v. Hertz Corporation allow claims for personal injuries to survive death.  See Tr. at 56:18-22 (Youngers).  The correct analysis, B. Nordwall argued, is whether a Rehabilitation Act claim is more like the excessive-force intentional tort claim in Oliveros v. Mitchell, or whether the Rehabilitation Act claim is more like the personal injury claim in Stang v. Hertz Corporation.  See Tr. at 56:22-25 (Youngers).  B. Nordwall pointed out that the Seventh Circuit observed in Soigner v. American Board of Plastic Surgery that an ADA claim is best characterized as one for personal injury.  See Tr. at 57:19-25 (Youngers).   B. Nordwall also cited to the Court for the first time Hickey v. Irving Independent School District, 976 F.2d 980 (5th Cir. 1992), for the proposition that "claims for discrimination are essentially claims for personal injury."  Tr. at 58:1-3 (Youngers).  In addition, B. Nordwall introduced Doukas v. Metropolitan Life Insurance Company, 882 F. Supp. 1197 (D.N.H. 1995) which "concludes a claim for discrimination brought under the ADA is best characterized as a claim for personal injury."  Tr. at 58:3-7 (Youngers).  B. Nordwall argued that Wagner v. Texas

A & M University stands for the proposition a Rehabilitation Act's statute of limitations is borrowed from personal injury suits.  See Tr. at 58:7-11 (Youngers).

B. Nordwall argued that Title VII, ADA, and Rehabilitation Act claims are all remedial, whereas § 1983 excessive force claims are punitive.  See Tr. at 58:17-20.  This distinction matters, B. Nordwall argued, because if ADA and Rehabilitation Act claims did not survive a claimant's death, then the statute's remedial purpose would be "totally gutted," because the hospital would have no incentive to follow the law if the claimant's death was imminent.  Tr. at 58:21-59:2 (Youngers).  She asserted that such an outcome would be counter to the passage of the acts.  See Tr. at 58:21-59:2 (Youngers).  The Court noted that the policy side is "tough," because, in § 1983 claims, a person's claim does not survive death.  Tr. 59:5-7 (Court).  B. Nordwall agreed, and stated that the policy is secondary, after noting that other courts have found that ADA, Rehabilitation Act, and Title VII claims are similar to personal injury cases.  See Tr. at 59:12-17 (Youngers).

The Court noted that for many years in New Mexico, § 1983 claims did not have a statute of limitations, so courts looked to other statutes of limitation to find a suitable statute of limitations for § 1983 claims.  See Tr. at 59:18-23 (Court).   The Court asked whether the Rehabilitation Act has a statute of limitations.  See Tr. at 59:24-25 (Court).  B. Nordwall answered that the Rehabilitation Act does not have a statute of limitations, which necessitates turning to state laws.  See Tr. at 60:1-4 (Youngers).  The Court asked whether the cases to which B. Nordwall cited referred to a statute of limitations or survivability.  See Tr. at 60:5-8 (Court).  B. Nordwall replied that the cases were about survivability, but if there were not a statute of limitations provision, they would also look to state law.  See Tr. at 60:9-11 (Youngers).  The Court asked whether New Mexico courts or the Tenth Circuit looked at New Mexico's available

statute of limitations to determine which applies for Rehabilitation Act claims.  See Tr. at 60: 12-15 (Court).  B. Nordwall replied that she had not researched the area, but that she speculates that a § 1983 statute of limitations applies.  See Tr. at 60:16-22 (Youngers).  The Court asked what reasoning would limit the Tenth Circuit survivability rule to excessive force cases only, instead of applying it to other § 1983 claims.  See Tr. at 60:23-25 (Court).  B. Nordwall replied that she was unsure whether Oliveros v. Mitchell could be read as "expressly deciding other issues."  Tr. at 61:6-9 (Youngers).  B. Nordwall informed the Court that, in New Mexico, a Wrongful Death Act claim that a personal representative brought under § 1983 was successful when the standard was the guards' deliberate indifference and not excessive force.  See Tr. at 61:10-62:1 (Youngers).

Memorial Medical asserted that B. Nordwall's characterization that both Soigner v. American Board of Plastic Surgery and Wagner v. Texas A & M University addressed survivability is misplaced.  See Tr. at 64:2-7 (Oertle).  Memorial Medical argued emphatically that those cases, like many civil rights cases, discuss the appropriate statute of limitations and adopt state personal injury statutes of limitation.  See Tr. at 64:8-15.  Memorial Medical argued that Wilson v. Garcia's holding established a state's personal injury statute of limitations as the standard for civil rights cases.  See Tr. at 64:22-65:2 (Oertle).  Memorial Medical acknowledged that whether a Rehabilitation Act claims survives the death of a disabled claimant is a novel issue with little case in the Tenth Circuit.  See Tr. at 65:19-24.  Memorial Medical points to Oliveros v. Mitchell, the Tenth Circuit's decision that intentional torts would not survive a claimant's death. See Tr. at 64:22-65:2 (Oertle).  Memorial Medical argues that the Rehabilitation Act requires a level of deliberateness, which is akin to an intentional tort.  See Tr. at 65:25-66:4.   (Oertle) Additionally, Memorial Medical argued that Wilson v. Garcia established only that a state's

personal injury statutes of limitation should be applied to federal civil rights claims when the federal law was silent, not that federal claims are to be treated like personal injury claims. See Tr. at 65:10-12 (Oertle).

The Court asked Memorial Medical the reasoning that supported a federal statute adopting state law survivability. See Tr. at 66:13-20 (Court). Memorial Medical answered that Smith v. Department of Human Services, 876 F.2d 832 (10th Cir. 1989) stands for the proposition that federal statutory body from which the claim arises controls the statute of limitations, but that, if that federal statutory body is silent, it is appropriate to look to the state law for an analogous statute of limitations. See Tr. at 66:21-67:5 (Oertle). It asserted that the Wilson v. Garcia's holding provided uniformity by establishing the state's personal injury statute of limitations. See Tr. at 66:12-16 (Oertle). Memorial Medical also asserted that the Tenth Circuit, in Oliveros v. Mitchell, applied the Smith v. Department of Human Services framework, first looking to the federal law for a survivability statute, and, because there was none, the Tenth Circuit turned to state laws. See Tr. at 66:17-21 (Oertle). Memorial Medical argued that, because New Mexico state law does not allow intentional torts to survive a claimant's death, the Rehabilitation Act claim should not survive J. Davis' death. See Tr. at 66:22-68-2 (Oertle).

Next, Memorial Medical argued that, under the Rehabilitation Act, B. Nordwall must demonstrate that Memorial Medical's failure to provide J. Davis an interpreter is deliberate indifference, not mere negligence, to J. Davis' rights under the Rehabilitation Act. Tr. at 12:10-19. Memorial Medical further argued that its administration put policies and resources in place for accommodating deaf patients, including auxiliary aids and an internal list of sign language interpreters. See Tr. at 18:4-8 (Oertle). Memorial Medical argued that it acted to ensure J. Davis' rights were not violated when Wilson met with B. Nordwall and S. Davis and when

- 36 -

Abrams sent a follow-up letter to B. Nordwall.   <u>See</u> Tr. at 18:8-24 (Oertle).   B. Nordwall countered that the question is not whether Memorial Medical had a policy and equipment in place for dealing with deaf patients, but whether Memorial Medical followed its own policy to afford J. Davis equal access to care.   <u>See</u> Tr. at 28:24-29:2 (Youngers).   B. Nordwall argued that Memorial Medical did not do enough to ensure that J. Davis had adequate means of communication.   <u>See</u> Tr. at 31:3-13 (Youngers).   The Court asked B. Nordwall if that was a question of negligence, rather than deliberate indifference to J. Davis' rights under the Rehabilitation Act.   <u>See</u> Tr. at 31:14-20 (Court).   B. Nordwall responded that, until the family "stomp[ed] and jump[ed] up and down," Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.   Tr. at 34:9-19 (Youngers).

The Court asked B. Nordwall whether the Rehabilitation Act's deliberate indifference standard differs from the Eighth Amendment to the United States Constitution deliberate indifference standard.   <u>See</u> Tr. at 26:16-26 (Court).   Additionally, the Court asked both parties whether, if the Rehabilitation Act claim fails, remand back to state court is appropriate.   <u>See</u> Tr. at 63:2-5 (Court).   Both parties conceded that remand to state court is appropriate if the Rehabilitation Act Claim fails.   <u>See</u> Tr. at 63:6-8 (Youngers); Tr. at 63:17-24 (Oertle).

On January 22, 2013, B. Nordwall filed the Plaintiff's Supplemental Response to Motion for Partial Summary Judgment.   B. Nordwall argues that § 504 of the Rehabilitation Act and 45 C.F.R § 84.52(d) compel Memorial Medical to provide deaf patients services "equal to and effective as" hearing patients.   Supplemental Response at 5 (quoting 45 C.F.R § 84.52(a)(2)-(3)). B. Nordwall argues that, although Memorial Medical had policies and procedures to accommodate deaf patients, Memorial Medical employees were "remarkably ignorant" to deaf patients' needs.   Supplemental Response at 8.   Next, B. Nordwall states that this case is

analogous to <u>Ulibarri v. City and County of Denver</u>, where that court found questions of fact regarding the adequacy of staff training and knowledge regarding communication strategies and assistive devices available for deaf detainees.  <u>See</u> Supplemental Response at 8 (citing <u>Ulibarri v. City and Cnty. of Denver</u>, 742 F. Supp. 2d at 1217).  Lastly, B. Nordwall argues that neither hospital in <u>Saltzman v. Board of Commissioner of the North Broward Hospital District</u> and <u>Freydel v. New York Hospital</u> restrained a patient as a result of a communication problem, but Memorial Medical restrained J. Davis.

Following B. Nordwall's Supplemental Response, Memorial Medical filed the Surreply on January 22, 2013.  Memorial Medical relies on two additional cases.  <u>See</u> Surreply at 7-10. First, in <u>Bircoll v. Miami-Dade County</u>, 410 F. Supp. 2d 1280 (S.D. Fla. 2006) <u>aff'd</u>, 480 F.3d 1072 (11th Cir. 2007), the United States District Court for the Southern District of Florida found that county officials did not act with deliberate indifference to the deaf arrestee's rights under the Rehabilitation Act when police, without ever using an ASL interpreter, arrested a deaf motorist for driving under the influence, processed him, and placed him in solitary confinement.  The driver alleged that, during his arrest, processing, and placement in solitary confinement, county officials intentionally discriminated against him, contrary to the ADA and to the Rehabilitation Act.  <u>See</u> Surreply at 7-8 (citing <u>Bircoll v. Miami-Dade County</u>, 410 F. Supp. 2d at 1286-1287). The district court, however, held that the officers who booked and processed the deaf arrestee did not act with deliberate indifference to his rights under the Rehabilitation Act, because the county officials believed their communication was effective.  480 F.3d at 1285-1286.  Next, Memorial Medical refers to <u>Constance v. State University of New York Health Science Center at Syracuse</u>, 166 F. Supp. 2d 663, 668 (N.D.N.Y 2001), where the United States District Court for the Northern District of New York found that the hospital did not act with deliberate indifference to

the deaf patient's Rehabilitation Act rights when the hospital had a policy addressing and auxiliary aids to accommodate deaf patients.   See Surreply at 8.   The standard for the Rehabilitation Act, Memorial Medical reiterates, is that Memorial Medical must have acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.   See Surreply at 10.   In addition, Memorial Medical asserts that other factors -- such as B. Nordwall's belief that the pen and paper it provided J. Davis was an insufficient auxiliary aid, that Memorial Medical restrained and sedated J. Davis, and that Memorial Medical did not act with "sufficient alacrity" in providing an interpreter -- does not show Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.   Surreply at 10.

Memorial Medical argues that Memorial Medical healthcare providers, like the providers in Bircoll v. Miami-Dade County and Constance v. State University of New York Health Science Center at Syracuse, believed their communications with J. Davis were effective and thus did not act with deliberate indifference to J. Davis' rights under the Rehabilitation Act.   See Surreply at 9.   In addition, Memorial Medical rebuts B. Nordwall's contention that J. Davis' restraint and sedation altered the care and treatment that Memorial Medical provided J. Davis.   See Surreply at 10.   Memorial Medical instead asserts that it acted in good faith, that communication with J. Davis was effective, and, therefore, that Memorial Medical did not act with deliberate indifference to J. Davis' rights under the Rehabilitation Act.   See Surreply at 10-11.

## LAW REGARDING SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).   See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50 (citations omitted). Unsupported assertions or conjecture as to factual disputes are not enough to survive summary judgment. See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988). The Court may consider only admissible evidence when ruling on a motion for summary judgment. See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

If a defendant seeks summary judgment, the defendant has the "initial burden to show that there is an absence of evidence to support the nonmoving party's case." Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(internal quotations omitted)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995)). Upon meeting that burden, the burden shifts to the plaintiff to "identify specific facts that show the existence of a genuine issue of material fact." Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164 (citations and internal quotations omitted). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted). The plaintiff, in opposing the motion, "must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164 (citations and internal quotations omitted). The mere existence of a scintilla of evidence in support of the plaintiff's position is not

sufficient; there must be evidence on which the factfinder could reasonably find for the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

## RELEVANT LAW REGARDING THE REHABILITATION ACT

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, states: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance  . . . ."  29 U.S.C. § 794. The United States Department of Health and Human Services enacted regulations "to effectuate § 504 of the Rehabilitation Act," which outline the federally funded health, welfare, and social services providers' accommodations for disabled individuals.  45 C.F.R. Part 84.1.  In Alexander v. Choate, 469 U.S. 287, 304 (1985), the Supreme Court noted that these regulations provide "an important source of guidance on the meaning of § 504."  469 U.S. at 304.  Importantly, these regulations describe the funding recipient's obligation to the hearing impaired and deaf:

> (1) A recipient to which this subpart applies that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question. . . .

> (3) For the purpose of this paragraph, auxiliary aids may include [brailled] and taped material, interpreters, and other aids for persons with impaired hearing or vision.

45 C.F.R. § 84.51.  The Rehabilitation Act, as supplemented by 45 C.F.R. § 84.52(d), requires health, welfare, and social services providers to provide patients with "appropriate auxiliary aides."  45 C.F.R. § 84.52(d)(1).  This standard does not require a particular aid, but only "appropriate aids" necessary to afford disabled persons "an equal opportunity to benefit from the service."  45 C.F.R. § 84.52(d)(1).

### 1.  The Rehabilitation Act's Burden Shifting Framework.

For Rehabilitation Act claims, the Tenth Circuit applies the burden-shifting framework that the Supreme Court established in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), which initially places the burden on the plaintiff to prove a prima facie case.  See Pushkin v. Regents of Univ. of Colo., 658 F.2d 1372, 1387 (10th Cir. 1981).  Because "the elements laid out in McDonnell Douglas Corporation v. Green to prove a prima facie case addressed only a refusal to rehire," the articulation of a plaintiff's prima facie case "varies depending on the type of adverse action the employee alleges was discriminatory."  Hunt v. Cent. Consol. Sch. Dist., No. CIV 11-1144 JB/WDS, 2013 WL 3214928 at *34 (D.N.M. June 12, 2013)(Browning, J.)(internal citations omitted)(citing E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007)).  The Tenth Circuit has held that a § 504 Rehabilitation Act prima facie case must demonstrate that "(1) [the] plaintiff is handicapped under the Act; (2) [the plaintiff] is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff."  Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1228 (10th Cir. 2009)(internal citations omitted).  See Hollonbeck v.  U.S. Olympic Comm., 513 F.3d 1191, 1194 (10th Cir. 2008)(same); Powers v. MJB Acquisition Corp., 184 F. 3d 1147, 1151 (10th  Cir. 1999)(same); See also, Woodman v. Runyon, 132 F.3d 1330, 1337 (10th Cir. 1997)(examining Rehabilitation Act claims in a federal employee setting).

Under the McDonnell Douglas Corporation v. Green burden-shifting framework, once the plaintiff has made out a prima facie case, the burden shifts to the defendant to show either that "the plaintiff was not an otherwise qualified handicapped person . . . or that [the individual's] rejection from the program was for reasons other than his handicap."  See Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1387.  If the defendant makes this showing, the burden

then shifts back to the plaintiff to rebut the defendant's evidence by proving that the defendant's evidence is pretext or that the evidence "encompasses unjustified consideration of the handicap itself."  658 F.2d at 1387.

In Pushkin v. Regents of University of Colorado, the Tenth Circuit relied on § 504 of the Rehabilitation Act as establishing criteria for the proper standard of review: "We repeat what we said before and that is that § 504 [of the Rehabilitation Act] sets forth its own criteria for scrutinizing claims under that statute."  Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1385. The Tenth Circuit explicitly rejected an equal protection analysis on the grounds that such analysis was "not appropriate where there is an alleged violation of a statute."  658 F.2d at 1383. Additionally, the Tenth Circuit held that a "disparate treatment" analysis is inappropriate for Rehabilitation Act claims.  658 F.2d at 1384-85.

## 2. To Recover Compensatory Damages, a Plaintiff Must Prove Intentional Discrimination by Showing Deliberate Indifference to the Strong Likelihood that the Pursuit of Questioned Policies Will Likely Result in a Violation of Federally Protected Rights.

The Tenth Circuit has held that "[i]ntentional discrimination is not an element of the plaintiff's prima facie case."  Powers v. MJB Acquisition Corp., 184 F.3d at 1152.  See also, Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1385 (same).  To recover compensatory damages, however, a plaintiff must prove intentional discrimination.  See Powers v. MJB Acquisition Corp., 184 F.3d at 1152 ("[e]ntitlement to compensatory damages under section 504 of the Rehabilitation Act requires proof the defendant has intentionally discriminated against the plaintiff"); Barber v. Colo. Dep't of Rev., 562 F. 3d at 1228-1229 ("To recover compensatory damages under § 504, a plaintiff must establish that the agency's discrimination was intentional."); Ferguson v. City of Phoenix, 157 F.3d 668, 676 (9th Cir. 1998)("[C]ompensatory damages are not available under Title II or § 504 absent a showing of discriminatory intent.").

- 43 -

Proving intentional discrimination does not require a showing of "personal animosity or ill will." Bartlett v. N.Y. State Bd. of Law Exam'rs, 156 F.3d 321, 331 (2d Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999). Rather, intentional discrimination "can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." Powers v. MJB Acquisition Corp., 184 F.3d at 1153.

The Tenth Circuit, along with the Second, Eighth, Ninth, and Eleventh Circuits, apply this standard to compensatory damages under the Rehabilitation Act. See Bartlett v. N.Y. State Bd. of Law Exam'rs, 156 F.3d at 331 (2d Cir. 1998)(adopting the deliberate indifference standard); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001)(adopting the deliberate indifference standard for Rehabilitation Act claims); Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011)(holding that recovery under the Rehabilitation Act requires deliberate indifference); Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 345 (11th Cir. 2012)("'Deliberate indifference' is the appropriate standard for defining discriminatory intent"). The United States Court of Appeals for the Fifth Circuit, however, does not apply this standard to compensatory damages alleged against public entities. See Delano–Pyle v. Victoria Cnty., 302 F.3d 567, 575 (5th Cir. 2002)("There is no 'deliberate indifference' standard applicable to public entities for the purposes of the ADA or the RA. However, in order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination." (internal citations omitted)).

      **a.  The Deliberate Indifference Standard in the Intentional Discrimination Context.**

The Tenth Circuit found summary judgment is proper for a compensatory damages claim under the Rehabilitation Act when no issue of material fact whether a defendant acted with

deliberate indifference to a substantially likely violation of the Rehabilitation Act.  See Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d at 1233 (affirming the United States District Court for the District of Colorado's grant of summary judgment).  Courts of Appeal approved the standard in Rehabilitation Act claims.  See, e.g., Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d at 1229 (adopting the deliberate indifference standard for a Rehabilitation Act claim)(citing City of Canton v. Harris, 489 U.S. at 388-92)); Duvall v. Cnty. of Kitsap, 260 F.3d at 1139 ("Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood" (citing City of Canton v. Harris, 489 U.S. at 389)); Bartlett v. New York State Bd. of Law Examiners, 156 F.3d at 331 (2d Cir. 1998)(citing City of Canton v. Harris for the deliberate indifference standard).

In City of Canton v. Harris, 489 U.S. 378 (1989), the Supreme Court held that a municipality may be liable for a 42 U.S.C. § 1983 claim only if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  489 U.S. at 388.  The plaintiff brought a claim against the municipality after being arrested, alleging a violation of her rights under 42 U.S.C. § 1983 for the municipality's failure to train its police officers when the municipality's policy assigned to the police supervisor sole discretion regarding when detainees would receive medical care.  The Supreme Court explained: "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983."  489 U.S. at 389.  Furthermore, the Supreme Court concluded that, in instances where the need for "more or different training is so obvious" that the inadequacy is "so likely to result in the violation of

constitutional rights," policymakers can "reasonably" be found "deliberately indifferent."[20]  489 U.S. at 389.

Courts look to the City of Canton v. Harris deliberate indifference standard when evaluating Rehabilitation Act claims.  One of the earliest cases to adopt the standard was Ferguson v. City of Phoenix, 931 F. Supp. 688 (D. Ariz. 1996), aff'd, 157 F.3d 668 (9th Cir. 1998).  The United States District Court for the District of Arizona found that the city of Phoenix did not act with deliberate indifference when it violated the rights of hearing-disabled users of the city's 911 system.  See 931 F. Supp. at 697.  In reaching its decision to use the deliberate indifference standard, neither the defendant nor the court's research "unearthed" any cases that established the standard to establish intentional discrimination for Rehabilitation Act claims.  931 F. Supp. at 697.  The district court then looked to the deliberate indifference standard that the Supreme Court articulated in City of Canton v. Harris and reasoned that "in § 1983 cases [against municipalities] conduct is intentional when 'the policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy, training, protocol or custom.'"  931 F.

---

[20] Courts use the City of Canton v. Harris deliberate indifference standard for Rehabilitation Act claims.  The Supreme Court's decision in Farmer v. Brennan, 511 U.S. 825 (1994), which examined deliberate indifference in the context of Eighth Amendment claims, distinguishes the City of Canton v. Harris deliberate indifference test.  The Supreme Court remarked:

It would be hard to describe the Canton understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.  Canton's objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases.

511 U.S. at 828.

Supp. at 697 (internal citations omitted).    The court adopted this standard, holding that "the inquiry collapses into a search for evidence of such deliberate indifference."  931 F. Supp. at 697.

The United States Court of Appeals for the Eleventh Circuit summarized the deliberate indifference standard by contrasting it with negligence:

> Deliberate indifference requires knowledge that a federally protected right is likely to be harmed and a failure to act upon that likelihood.  Negligence, even if gross, cannot constitute deliberate indifference.  For conduct to be deliberately indifferent, there must be both knowledge of likely harm and failure to act on the part of a policymaker, that is, someone capable of making an "official decision" on behalf of the organization.

Saltzman v. Bd. of Comm'rs of N. Broward Hosp. Dist., 239 F. App'x 484, 487-88.

### b.   The Deliberate Indifference Standard in Hospital Settings.

Given that neither the United States District Court for the District of New Mexico nor the Tenth Circuit have ruled on a deaf patient's Rehabilitation Act claim in a hospital setting, cases from outside the Tenth Circuit are instructive.  Circuit Courts have held that when a hospital maintains a policy and auxiliary aids to accommodate deaf patients, the hospital staff knows about the policy and auxiliary aids, and the hospital staff attempts to accommodate the deaf patient, the hospital does not act with deliberate indifference to a patient's Rehabilitation Act rights, even if the requested accommodation is not quickly, or ever, supplied.  See Freydel v. N. Y. Hosp., 2000 WL 1836755, at **4-5 (holding that the hospital did not act with deliberate indifference when it had a policy, procedure, and auxiliary aids to accommodate deaf patient, but the hospital did not immediately obtain an interpreter after the deaf patient's multiple interpreter requests); Saltzman v. Bd. of Comm'rs of N. Broward Hosp. Dist., 239 F. App'x at 484 (holding that the hospital was not deliberately indifferent when it failed to provide a sign language interpreter for the deaf patient and wife, but instead used alternative auxiliary aids to

communicate with the patient).  A hospital that simply has a policy and auxiliary aids, however, but ignores deaf patients' requests for accommodation or withholds access to auxiliary aids, acts with deliberate indifference to a patient's rights under the Rehabilitation Act.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268 (2d Cir. 2009)(holding that a genuine issue of material fact precluded summary judgment on the deaf patient's Rehabilitation Act claim where there was evidence that the hospital ignored multiple requests for an interpreter ahead of the deaf patient's admission and that the staff denied the deaf patient access to auxiliary aids after surgery).

In Freydel v. New York Hospital, the Second Circuit upheld the district court's summary judgment decision that the failure of the defendant, New York Hospital, to provide an interpreter for the plaintiff after multiple requests did not act with deliberate indifference to the Rehabilitation Act rights of the plaintiff, Freydel.  See 2000 WL 1836755, at **1, 3.  Freydel, a Russian immigrant, communicated primarily through Russian sign language.  Id. at *1.  She had no "intelligible speech" abilities.  Id.  Upon Freydel's admission to New York Hospital, Freydel's family made multiple informal requests to hospital healthcare providers for a Russian Sign Language interpreter.  See 2000 WL 1836755, at *1.  The hospital staff directed the family to the Patient Services Agency.  See 2000 WL 1836755, at *1.  At the time of Freydel's admission, New York Hospital had a policy and system to deliver interpreter services.  See 2000 WL 1836755, at *4.  New York Hospital's policy directed patients and families to the Patient Services Administration to arrange for interpretive services.  The office was closed, but the family eventually made the request using a TTY phone.[21]  See 2000 WL 1836755, at *1.  New York Hospital attempted to secure an interpreter, but was unsuccessful, notwithstanding that

---

[21] A TTY machine "allows the deaf to communicate (by phone or in person) with people with normal hearing, through a relay service."  Loeffler v. Staten Island Univ. Hosp., 582 F. 3d at 272.

Freydel's family provided New York Hospital with an appropriate interpretive service's contact information.  2000 WL 1836755, at **1-2.  Freydel's family moved, by order to show cause, for preliminary injunctive relief.   See 2000 WL 1836755, at *2.  New York Hospital promptly provided interpretive services daily for two hours for the remainder of Freydel's admission.  See 2000 WL 1836755, at *2.

The Second Circuit noted that, even if the hospital directed the Freydel family to the Patient Services Agency when it was closed, or even if hospital staff were "insufficiently responsive" to the Freydel's requests, and although the hospital made "a number of mistakes" in responding to Freydel's requests, Freydel failed to establish that the New York Hospital acted with deliberate indifference to Freydel's rights under the Rehabilitation Act.  2000 WL 1836755, at *4.  The court reasoned that failing to secure an interpreter "over a weekend, or more, cannot by itself suffice to maintain a claim of deliberate indifference."  2000 WL 1836755, at *4.  The Second Circuit pointed out that the hospital had no previous complaints and, after Freydel's admission, modified its policy for easier access to interpretive services.  See 2000 WL 1836755, at *4.   The Second Circuit dismissed the plaintiff's argument that basic problems with the hospital's policy and its implementation amount to the hospital acting with deliberate indifference to Freydel's rights under the Rehabilitation Act.  See 2000 WL 1836755, at *4.  The Second Circuit instead reasoned that because the hospital had a policy to secure interpretive services, staff members were aware of the method for acquiring interpreters, and the family was appropriately directed, the hospital did not act with deliberate indifference to Freydel's Rehabilitation Act rights.  See 2000 WL 1836755, at *4.  The court reasoned that the existence of resources and the hospital's attempt at following procedure to obtain those resources showed that New York Hospital staff attempted to accommodate Freydel.  See 2000 WL 1836755, at *4.

While New York Hospital was initially unsuccessful because of "a number of mistakes," that failure is not equivalent to the New York Hospital's policymakers knowing that the existing policy would deny Freydel her rights under the Rehabilitation Act, yet refusing to act, especially given that New York Hospital had no previous record of violating deaf patients' rights.  2000 WL 1836755, at *4.

In Saltzman v. Board of Commissioners of the North Broward Hospital District, the Eleventh Circuit upheld summary judgment granted in the favor of Board of Communication of the North Broward Hospital District ("Northwest Medical Center"), after finding that Northwest Medical Center did not act with deliberate indifference to Saltzman's rights under the Rehabilitation Act when it failed to secure a sign language interpreter for Saltzman, the deaf plaintiff, even after Saltzman and his family's daily requests for an interpreter.  See 239 F. App'x at 485.  Both Saltzman and his wife communicated primarily through ASL, with a limited ability to write simple "word strings without grammatical or syntactical structure."  239 F. App'x at 485.  The Saltzmans' daughter, Sheri, regularly attended Saltzman's doctor appointments to translate for him.  See 239 F. App'x at 485.  Two days after Saltzman's admission, Sheri arrived and began requesting an interpreter every day for the remainder of Saltzman's stay.  See 239 F. App'x at 486.  Sheri also provided Northwest Medical Center with an interpretive service's business card.  See 239 F. App'x at 486.  Sheri signed for Saltzman, but could not communicate anything technical medically.  See 239 F. App'x at 486.  Northwest Medical Center possessed TTY phones to assist deaf patients and followed its existing policy for accommodating deaf patients.  See 239 F. App'x at 488.  Northwest Medical Center tried to locate an interpreter once, using its own interpreter services contact information, but was unsuccessful because of conflicting schedules.  See 239 F. App'x at 488.  Because the hospital was a stroke specialty

center, the staff was trained and experienced in non-verbal communication, including gesturing, fingerspelling, and other aides.   See 239 F. App'x at 486.   Despite multiple requests for an interpreter and despite Sheri providing contact information for interpretive services, the hospital never obtained an interpreter.   See 239 F. App'x at 486.   The hospital relied on fingerspelling, writing, and hand signals to explain to Saltzman his medical condition.   Id. at 486.   Even so, Saltzman did not comprehend the meaning of "stroke."   Id.   The Eleventh Circuit reasoned that Northwest Medical Center's policy and auxiliary aids, in conjunction with the absence of a Northwest policymaker's intent to discriminate against deaf patients, precluded finding that the hospital acted with deliberate indifference to Saltzman's rights under the Rehabilitation Act, notwithstanding the fact that the hospital failed to execute its own policy effectively.   See 239 F. App'x at 488.   The Eleventh Circuit noted that, while Northwest Medical Center may have been negligent in its attempt to secure an interpreter pursuant to its policy, "negligence is not intentional discrimination."   Id.

In Loeffler v. Staten Island University Hospital, the Second Circuit held that an issue of material fact existed whether the defendant, Staten Island University Hospital, acted with deliberate indifference to the Loeffler's rights under the Rehabilitation Act.   The Second Circuit therefore vacated and remanded the case back to the United States District Court for the Eastern District of New York.   See 582 F.3d at 276.   Both R. Loeffler and J. Loeffler were deaf.   See id. at 270.   The Loefflers and Staten Island University Hospital agreed that, if healthcare providers or the patient determined an interpreter was needed, the hospital's policy required the hospital to provide an interpreter, obtained through the hospital's Speech and Hearing Center or an outside agency.   See id. at 271.   The Loefflers asserted that, weeks ahead of R. Loeffler's scheduled surgery, they requested an ASL interpreter multiple times, but the hospital denies that the family

made the request.   See id. at 270.  The Loefflers allegedly attempted to contact the appropriate

Patient Representative Department four times on the day of the surgery requesting an interpreter,

but the hospital acknowledges only one request.   See id. at 272.  The hospital, despite some

attempts, never provided an interpreter.   See id. at 273.  The hospital instead relied on the

Loefflers' minor children to act as interpreters.   Id.  The children missed school, and the

Loefflers alleged that the hospital gave the Loefflers' daughter a pager to be "on call" as an

interpreter.  Id.

The Second Circuit held that there were genuine issues of fact, precluding summary

judgment, including: (i) whether the Loefflers requested an interpreter upon arrival at the

hospital, as well as before and after Loeffler's surgery; (ii) whether the treating physician was a

policymaker who "laughed off" multiple requests for a sign language interpreter by Loeffler and

his family; and (iii) other healthcare providers refused to accommodate Loeffler with auxiliary

aids including an interpreter and a TTY device.  The Second Circuit held that a reasonable jury

could conclude the people at Staten Island University Hospital "had actual knowledge of

discrimination against the Loefflers, had authority to correct the discrimination, and failed to

respond adequately."  582 F.3d at 276.  The Second Circuit held that the district court did not

construe the facts in the light most favorable to the Loefflers, specifically on the factual issue

whether the Loefflers made multiple requests before the surgery, whether the hospital failed to

comply with the Loefflers' requests for the TTY, and whether Loeffler's doctor, arguably an

administrator, "laughed off" an interpreter request.   582 F.3d at 276.  The Second Circuit

reasoned that, even if the hospital had a general interpretive services policy and auxiliary aids,

those policies and aids are insufficient if policymakers are unaware of how the policy functions,

ignore requests, or refuse to accommodate a patient.  See 582 F. 3d at 276-77.

**RELEVANT LAW REGARDING THE SURVIVABILITY OF A CLAIM UNDER
SECTION 504 OF THE REHABILITATION ACT**

"The question of the survival of an action grounded in federal law is governed by federal common law when . . . there is no expression of contrary intent." Smith v. Dep't of Human Servs., 876 F.2d 832, 834 (10th Cir. 1989).   "The general rule under the federal common law is that an action for a penalty does not survive the death of the plaintiff." Smith v. Dep't of Human Servs., 876 F.2d at 834-35 (citing Schreiber v. Sharpless, 110 U.S. 76, 80 (1884)).   Courts thus "infer from a reading of the relevant statute and its history whether a cause of action is penal or remedial in nature." Smith v. Dep't of Human Servs., 876 F.2d at 835.   The Tenth Circuit has approved of a three-factor test, which the United States Court of Appeals for the Sixth Circuit articulated in Murphy v. Household Finance Corp., 560 F.2d 206 (6th Cir. 1977), to analyze whether a statute is remedial or punitive:

> [T]he [Sixth Circuit] developed a three-factor analysis requiring an assessment of "1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; 2) whether recovery under the statute runs to the harmed individual or to the public; and 3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered."

Smith v. Dep't of Human Servs., 876 F.2d at 835 (quoting Murphy v. Household Finance Corp., 560 F.2d at 209).

 "'If federal law does not provide a rule of decision in a civil rights case, federal law will incorporate the appropriate state law, unless that law is inconsistent with the Constitution and laws of the United States.'" Slade v. United States Postal Serv., 952 F.2d 357, 360 (10th Cir. 1991)(quoting Bennett v. Tucker, 827 F.2d 63, 67 (7th Cir. 1987)).   Thus, in Slade v. United States Postal Service, the Tenth Circuit held that, because Oklahoma has a state survivability statute that provides for survivability of personal injury claims, a plaintiff's Title VII employment discrimination claim survived the plaintiff's death. See 952 F.2d at 360. See also,

Marks v. U.S. West Direct, No. 98-1043, 1998 U.S. App. LEXIS 31150, at *1 (10th Cir. Dec. 11, 1998)(unpublished)(holding that a Title VII claim survived the plaintiff's death)(citing Slade v. United States Postal Serv., 952 F.2d at 360; Smith v. Dep't of Human Servs., 876 F.2d at 836-37; Colo. Rev. Stat. § 13-20-101(1)).

      1.      **The Survivability of ADA and Rehabilitation Act Claims are Co-Extensive.**

The remedies for ADA and Rehabilitation Act violations are co-extensive.  See 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."); 42 U.S.C. § 12132.  The Ninth Circuit has thus stated that "[t]hese statutes require that ADA and Rehabilitation Act remedies be construed the same as remedies under Title VI."  Ferguson v. City of Phoenix, 157 F.3d 668, 673 (9th Cir. 1998).  See, e.g., Pottgen v. Mo. State High Sch. Activities Ass'n, 40 F.3d 926, 930 (8th Cir. 1994)("Congress intended Title II to be consistent with section 504 of the Rehabilitation Act. . . .  In addition, regulations interpreting Title II must be consistent with regulations relating to section 504 of the Rehabilitation Act.").  Similarly, the United States Court of Appeals for the Eleventh Circuit, analyzing for the first time the appropriate statute of limitations under Title II of the ADA and the Rehabilitation Act, held that they should be analyzed together: "Because causes of action brought under Title II of the ADA and the Rehabilitation Act are essentially identical, we will consider the two statutes simultaneously and apply the same statute of limitations to both."  Everett v. Cobb Cnty. Sch. Dist., 138 F.3d 1407, 1409 (11th Cir. 1998).  The courts are split, however, whether the survivability of ADA and Rehabilitation Act claims are determined based on state law under 42 U.S.C. § 1988(a), or

whether the survivability depends on whether the claims are remedial or penal in nature.[22] Neither the Tenth Circuit nor the United States District Court for the District of New Mexico have analyzed this issue.

**2.      Courts have Split Whether Survivability of ADA and Rehabilitation Act Claims Depends on State Law.**

The issue that causes the confusion as to whether these claims survive the claimants' death is whether 42 U.S.C. § 1988 applies to the Rehabilitation Act.  In Kettner v. Compass Group USA, Inc., 570 F. Supp. 2d 1121, 1133-34 (D. Minn. 2008), the Honorable Susan Richard Nelson, United States Magistrate Judge, concluded that only the plaintiff's claims for punitive damages abated, reasoning that, while "[m]any courts appear to have applied Section 1988(a) to [ADA and Rehabilitation Act] claims," "'this Court believes these lines of cases to be erroneous.'"  570 F. Supp. 2d at 1133 (alteration omitted)(quoting Hanson v. Atl. Research Corp., No. 4:02CV00301 SMR, 2003 U.S. Dist. LEXIS 2285, 2003 WL 430484, *3 (E.D. Ark. Feb. 14, 2003)).  Judge Nelson relies on Fleming v. United States Postal Service AMF O'Hare, 27 F.3d 259, 262 (7th Cir. 1994), in which the United States Court of Appeals for the Seventh

---

[22] Subsection a to Section 1988 of Title 42 of the United States Code provides:

> The jurisdiction in civil and criminal matters conferred on the district circuit courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

42 U.S.C. § 1988(a).

Circuit, with the Honorable Richard Allen Posner, United States Circuit Judge, writing the

decision for the panel, held that § 1988(a) does not apply to Title VII or the Rehabilitation Act:

> [T]he present case was not brought under 42 U.S.C. § 1983 (and could not
> have been, because the defendants were not acting under color of state law),
> but under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and
> the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 et seq. These statutes are not
> affected by 42 U.S.C. § 1988(a) . . . .

27 F.3d at 262.

The majority of courts, however, have differed with Judge Posner and Judge Nelson.

Three years after Judge Posner's opinion in <u>Fleming v. United States Postal Service AMF</u>

<u>O'Hare</u>, a separate Seventh Circuit panel held that, whether by federal common law or by §

1988(a), state law governed survivability of a plaintiff's ADA claim, "whether by incorporation

through federal common law or more directly (a question we need not resolve here), state law

governs the survival of civil rights actions like the ADA claim asserted . . . ."  <u>Hutchinson v.</u>

<u>Spink</u>, 126 F.3d 895, 898 (7th Cir. 1997)(citing <u>Robertson v. Wegmann</u>, 436 U.S. 584, 589-90

(1978)(holding that, under § 1988, state law determines the survivability of a plaintiff's § 1983

claim after the plaintiff's death)).  Similar and in addition to the Seventh Circuit, the majority of

other United States Courts of Appeals look to state law to fill in "deficiencies in federal law,"

especially in relation to statutes of limitation, and hold that § 1988 functions as a "common-law

borrowing doctrine"  for all civil rights cases.  <u>Duck v. Isle of Wight Cnty. Sch. Bd.</u>, 402 F.3d

468, 473 (4th Cir. 2005)(Duncan, J.)(holding that courts must look to state law statutes of

limitations for personal injury laws to determine the statutes of limitations for Rehabilitation Act

claims).  For example, in <u>Baker v. Board of Regents of Kansas</u>, 991 F.2d 628, 631-32 (10th Cir.

1993), the Tenth Circuit held that, like for a § 1983 civil-rights action, the applicable state's

statute of limitations filled the Rehabilitation Act's deficiency in not providing a statute of

limitations, because "Section 504 of the Rehabilitation Act protects an individual with handicaps from discrimination. It is a 'civil rights statute . . . closely analogous to section 1983.'" 991 F.2d at 631-32 (quoting Hall v. Knott County Bd. of Educ., 941 F.2d 402, 408 (6th Cir.1991)). Accord Holmes v. Texas A & M Univ., 145 F.3d 681, 684 (5th Cir. 1998)("Neither Title II of the ADA nor the Rehabilitation Act specify a statute of limitations.  The selection of a limitations period applicable to Rehabilitation Act cases is governed by 42 U.S.C. § 1988(a) . . . .")(citing Hickey v. Irving Indep. Sch. Dist., 976 F.2d 980, 982 (5th Cir. 1992)(holding that § 1988 governs selection of Rehabilitation Act claims' statute of limitations)); McCormick v. Miami Univ., 693 F.3d 654, 662 (6th Cir. 2012)("Since the Rehabilitation Act does not specify a statute of limitations, we look to the most analogous state law and adopt its limitations period.")(citing North Star Steel Co. v. Thomas, 515 U.S. 29, 34); Soignier v. Am. Bd. of Plastic Surgery, 92 F.3d 547, 550 (7th Cir. 1996)("The ADA, like many federal civil rights statutes, does not contain a specific statute of limitations. Thus, the most appropriate state limitations period applies.")(citing 42 U.S.C. § 1988(a); Wilson v. Garcia, 471 U.S. 261, 266-67 (1985)(holding that, "with respect to claims enforceable under the Reconstruction Civil Rights Act," § 1988 is Congress' "implicit[] endorse[ment]" of the "settled practice . . . to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so")); Everett v. Cobb Cnty. Sch. Dist., 138 F.3d at 1409 ("Where a federal statute does not contain a limitations period courts should look to the most analogous state statute of limitations.")(citing Wilson v. Garcia, 471 U.S. at 266-67).

Additionally, several United States District Courts look to § 1988 to fill gaps in the ADA and the Rehabilitation Act.  As to survivability, within the Tenth Circuit, the United States District Court for the District of Colorado in Rosenblum v. Colo. Dep't of Health, 878 F. Supp.

1404 (D. Colo. 1994)(Carrigan, J.), reasoned that, under § 1988, courts "must look to state law" to determine whether an ADA claim abates upon the claimant's death -- provided that state law is not inconsistent with the federal law.  Rosenblum v. Colo. Dep't of Health, 878 F. Supp. at 1408-09 (citing Robertson v. Wegmann, 436 U.S. 584, 588-89 (1978); Slade v. United States Postal Serv., 952 F.2d at 360).  More recently, in 2006, the District of Colorado extended Rosenblum v. Colo. Dep't of Health to apply to Rehabilitation Act claims as well.  See Montez v. Owens, Civil Action No. 92-cv-870-WEN-MEH, 2006 U.S. Dist. LEXIS 59234, at **17-18 (D. Colo. Aug. 22, 2006)(Nottingham, J.).  Accord United States v. Morvant, 843 F. Supp. 1092, 1095 (E.D. La. 1994).  The majority of United States District Courts, like the United States Courts of Appeals, look to state law under § 1988 to provide the statutes of limitations for ADA and Rehabilitation Act Claims.  See, e.g., Larson v. Snow Coll., 189 F. Supp. 2d 1286, 1292 (D. Utah 2000)(looking to state law for statutes of limitations for § 1983, ADA, and Rehabilitation Act claims); Estate of Morrissey v. Rockingham Mem. Hosp., 2006 U.S. Dist. LEXIS 4627, at *7 (W.D. Va. Feb. 7, 2006)("Titles II and III of the Americans with Disabilities Act do not contain an express statute of limitations, however, where no limitations period is specified, '42 U.S.C. § 1988(a) provides for the selection of an appropriate common-law statute of limitations, which is most applicable to the federal action.'")(quoting Wolsky v. Med. Coll. of Hampton Roads, 1 F.3d 222, 223 (4th Cir. 1993)).

The Sixth Circuit, however, in an unpublished opinion in 1991, held that, because the Rehabilitation Act is remedial, rather than punitive, Rehabilitation Act claims survive the claimant's death -- at least to the extent that the claimant seeks compensatory damages.  See Cook v. Hairston, No. 90-3437, 948 F.2d 1288, 1991 U.S. App. LEXIS 28537, 1991 WL 253302, at *18-19 (6th Cir. Nov. 26, 1991).  The Sixth Circuit did not mention 42 U.S.C. § 1988,

but relied on the Tenth Circuit's decision in <u>Smith v. Department of Human Services</u> for the proposition that "'[t]he typical rule under federal common law is that an action for a penalty does not survive the death of the plaintiff,'" <u>Cook v. Hairston</u>, 1991 U.S. App. LEXIS 28537, at *17 (quoting <u>Smith v. Dep't of Human Servs.</u>, 876 F.2d at 834), and concluded that the Rehabilitation Act is remedial:

> The purpose of § 504 was to establish "a comprehensive federal program aimed at improving the lot of the handicapped." <u>Consolidated Rail Corp. v. Darrone</u>, 465 U.S. 624 (1984). The Act itself speaks to the individual when it states, "No otherwise handicapped individual. . . ." Therefore § 504 is directed more to improving the lot of certain handicapped individuals who may suffer discrimination, rather than to redressing wrongs suffered by the general public. Recovery under § 504 runs to the individual, as provided under 29 U.S.C. § 794a(a)(2). Additionally, the Act does not authorize any damages in excess of the harm suffered. Based on these factors, § 504 meets the test set out in <u>Murphy</u>, for being a remedial rather than punitive statute. Therefore, any claim under § 504 survives the death of the plaintiffs.

1991 U.S. App. LEXIS 28537, at **18-19.  No court to date has cited the Sixth Circuit's decision in <u>Cook v. Hairston</u>.  Nevertheless, the United States District Courts for the District of Minnesota and the Eastern District of Arkansas have similarly reasoned and concluded that compensatory damages claims under the Rehabilitation Act survive the claimant's death.  <u>See Kettner v. Compass Grp. USA, Inc.</u>, 570 F. Supp. 2d at 1133-34; <u>Estate of Stoick ex rel. Spry v. McCorvey</u>, Civil No. 10-1030 (DSD/AJB), 2011 WL 3419939, 2011 U.S. Dist. LEXIS 84965, *8 (D. Minn. July 29, 2011)(holding that, because the statutes are remedial in nature, "'except for liquidated or punitive damages claims,'" money damages claims under the ADA and Rehabilitation Act survive the plaintiff's death)(quoting <u>Kettner v. Compass Grp. USA, Inc.</u>, 570 F. Supp. 2d at 1134); <u>Hanson v. Atl. Research Corp.</u>, 2003 U.S. Dist. LEXIS 2285, at **10-12.

> **3.**      **The Tenth Circuit Would Look to New Mexico Personal Injury Law Regarding Survivability to Determine Whether a Plaintiff's Rehabilitation Act Claim Survives the Plaintiff's Death.**

The Tenth Circuit, like the Seventh Circuit, has not been consistent in its application of state law to determine the survivability of post-"Reconstruction Era civil rights statutes," Fleming v. United States Postal Serv. AMF O'Hare, 27 F.3d at 261, including Title VII, the ADA, and the Rehabilitation Act.  In Smith v. Department of Human Services, the Tenth Circuit did not apply state law to an ADEA claim, but rather adhered to the federal common-law analysis in which survivability depends on whether a claim is remedial or penal, and held that the plaintiff's claim did not survive the plaintiff's death, because "this action is essentially for liquidated damages, penal in nature."  876 F.2d at 837.  In its two most recent decisions, however, although the Tenth Circuit did not specifically hold that § 1988(a) applies, it nevertheless determined that the survivability of federal claims for which there is no survivability provision depends on appropriate state law.  Because these two decisions and the majority of courts look to state law to fill gaps in federal civil rights statutes, including the ADA and the Rehabilitation Act, the Court concludes that the Tenth Circuit would look to New Mexico law to determine whether a plaintiff's Rehabilitation Act claims survives the plaintiff's death.

> **a.** **The Tenth Circuit Incorporates the Appropriate State Law for Purposes of Deciding Whether a Rehabilitation Act Claim Survives the Claimant's Death.**

In Smith v. Department of Human Resources, the plaintiff brought a claim for age discrimination under the ADEA seeking back pay and reinstatement after the defendant Oklahoma Department of Human Resources terminated his employment.  See 876 F.2d at 833. While the federal ADEA claim was stayed, the Plaintiff won a parallel state-court lawsuit based on his termination, and the Oklahoma state court awarded him back pay and ordered his reinstatement.  See 876 F.2d at 833.  After the state court award was final, the federal stay was

lifted, and the plaintiff sought only liquidated damages under the ADEA at trial.  See 876 F.2d at 833-34.  The plaintiff died, however, before the federal district court's decision, which found that the plaintiff was not entitled to liquidated damages.  See 876 F.2d at 834.  The first issue that the Tenth Circuit addressed on appeal was whether the Tenth Circuit had jurisdiction to hear the appeal, as the defendant argued that the ADEA claim abated upon the plaintiff's death.  See 876 F.2d at 834.  Because the ADEA does not contain a survivability provision, the Tenth Circuit held that the issue of the survivability of the plaintiff's claim turned on "whether Smith's action for liquidated damages under the ADEA is penal such that it does not survive its death."  876 F.2d at 834-35 (citing Schreiber v. Sharpless, 110 U.S. at 80).  The Tenth Circuit recognized that the ADEA, generally, is remedial, as "the ADEA['s] . . . primary purpose is to compensate . . . individuals who have suffered employment discrimination because of their advanced age."  876 F.2d at 835 (quotation marks omitted)(quoting Asklar v. Honeywell, Inc., 95 F.R.D. 419, 422 (D. Conn. 1982)).  The Tenth Circuit reasoned, however, that liquidated damages was another matter, as "[t]he legislative history reflected that the liquidated damages provision was intended to provide an effective deterrent to willful violations of the ADEA."  876 F.2d at 836. Notwithstanding that "claims for reinstatement, backpay, and other benefits under the ADEA are clearly remedial in nature, and . . . that the ADEA statute itself is a penal statute," the Tenth Circuit held that the plaintiff's "action is essentially for liquidated damages, penal in nature," and thus did not survive the plaintiff's death.  876 F.2d at 837.

Courts that have held compensatory damages claims under these post-Reconstruction Era civil rights statutes survive the plaintiffs' deaths because these statutes are remedial, and not punitive, in nature cite to the Tenth Circuit's 1989 decision in Smith v. Department of Human Services for support.  See, e.g., Cook v. Hairston, 1991 U.S. App. LEXIS 28537, at *17 (quoting

Smith v. Dep't of Human Servs., 876 F.2d at 834); Kettner v. Compass Grp. USA, Inc., 570 F.

Supp. 2d at 1132 (quoting Smith v. Dep't of Human Servs., 876 F.2d at 834); Hanson v. Atl.

Research Corp., 2003 U.S. Dist. LEXIS 2285, at *7 (citing, as an e.g. cite Smith v. Dep't of

Human Servs., 976 F.2d at 834-35, for the proposition that, under federal common law, punitive

and liquidated damages cannot survive a plaintiff's death, because they are punitive in nature).

    Two years after Smith v. Department of Human Services, the Tenth Circuit cited to Smith

v. Department of Human Services for the proposition that federal common law applies to

determine whether a Title VII claim survived the plaintiff's death, but effectively applied § 1988

to answer the question whether the plaintiff's Title VII claim survived, by relying on a Sixth

Circuit opinion in which the Sixth Circuit applied § 1988 to a § 1983 claim: "'If federal law does

not provide a rule of decision in a civil rights case, federal law will incorporate the appropriate

state law, unless that law is inconsistent with the Constitution and the laws of the United

States.'"  Slade v. United States Postal Serv., 952 F.2d at 360 (quoting Bennett v. Tucker, 827

F.2d 63, 67 (7th Cir. 1988)(quoting 42 U.S.C. § 1988)).  In Slade v. United States Postal Service,

the plaintiff brought a Title VII action for lost wages and attorney's fees against the United

States Postal Service, alleging that the Postal Service's decision not to hire him was based on

racial discrimination.  See 952 F.2d at 358-59.  The plaintiff died, however, before the appeal of

the district court's judgment, and the Postal Service moved to dismiss the case on the grounds

that the plaintiff's Title VII claim did not survive his death.  See 952 F.2d at 359-60.  The Tenth

Circuit held that the plaintiff's wife was properly substituted as a party, because the survivability

of a Title VII claim depends on the appropriate state law, which the Tenth Circuit determined to

be Oklahoma's personal injury statute, providing for the survival of personal injury claims

beyond a plaintiff's death.  See  952 F.2d at 360.  In support of the proposition that the Title VII

claim's survivability is based on incorporation of the appropriate state law, the Tenth Circuit cited to the Seventh Circuit's opinion in Bennett v. Tucker, in which the Seventh Circuit determined that, under § 1988(a), a plaintiff's § 1983 claim survived the plaintiff's death.  See Bennett v. Tucker, 827 F.2d at 67.

In 1998, the Tenth Circuit, in an unpublished opinion, relied on Slade v. United States Postal Service and on Smith v. Department of Human Services to hold that a plaintiff's action with claims under the ADEA, Title VII, and the Equal Pay Act, 29 U.S.C. § 206, survived the plaintiff's death.  See Marks v. U.S. West Direct, 1998 U.S. App. LEXIS 31150, at *2.  The Tenth Circuit's unpublished opinion in Marks v. U.S. West Direct did not provide much insight into the Tenth Circuit's reasoning, but, in addition to Slade v. United States Postal Service and Smith v. Department of Human Services, the Tenth Circuit also cited to the Colorado state law on survivability:

> Counsel for US West Direct has notified this court that Ms. Marks is deceased. We determined that Ms. Marks' action would survive her death. See, e.g., Slade ex rel. Slade v. United States Postal Serv., 952 F.2d 357, 360 (10th Cir. 1991) (looking to state law to determine whether Title VII action will survive party's death); Colo. Rev. Stat. § 13-20-101(1) (all actions, except those for slander or libel, survive party's death though certain identified damages may not be awarded); Smith v. Dep't of Human Servs., 876 F.2d 832, 836-37 (10th Cir. 1989)(ADEA action seeking certain identified remedies may survive party's death).

Marks v. U.S. West Direct, 1998 U.S. App. LEXIS 31150, at **2-3.  Because the Tenth Circuit cited to the Colorado state law on survivability in Marks v. U.S. West Direct to hold that the plaintiff's claims survived, it supports the conclusion that the Tenth Circuit, at least in relation to the ADEA, Title VII, and the Equal Pay Act, incorporates appropriate state law for purposes of determining whether these claims survive the claimant's death.

Moreover, the only district court opinion in the Tenth Circuit that the Court could find analyzing the survivability of an ADA or Rehabilitation Act claim cited to Slade v. United States Postal Serv. in support for its conclusion that, "pursuant to 42 U.S.C. § 1988, the court must look to state law" to determine whether an ADA claim survives the claimant's death. Rosenblum v. Colo. Dep't of Health, 878 F. Supp. at 1408-09.  And in 2006, the District of Colorado quoted Rosenblum v. Colo. Dep't of Health to extend the same statute to apply to the survivability of Rehabilitation Act claims.  See Montez v. Owens, 2006 U.S. Dist. LEXIS 59234, at **17-18.

The Court agrees with the United States District Court for the District of Colorado that the Tenth Circuit would incorporate appropriate New Mexico state law to determine whether a plaintiff's Rehabilitation Act claim survives the plaintiff's death, even if not by means of explicitly applying 42 U.S.C. § 1988(a).  Although the Tenth Circuit's opinion in Smith v. Department of Human Services takes the opposite approach, the two most recent Tenth Circuit opinions in Slade v. United States Postal Service and Marks v. U.S. West Direct rely on state law to provide federal claims' survivability provisions.  On the one hand, the Court agrees with the Honorable Stephen M. Reasoner, United States District Judge of the Eastern District of Arkansas, who pointed out that "[t]he list of cases to which Section 1988(a), by its very language, applies does not include ADA or Title VII cases."  Hanson v. Atl. Research Corp., 1991 U.S. App. LEXIS 28537, at *10. [23]  Given the courts' recognition that the Rehabilitation

---

[23] By its language, 42 U.S.C. § 1988(a) applies to cases brought under the laws in "titles 13, 24, and 70 of the Revised Statutes."  Title 13 of the Revised Statutes is codified in various sections of Titles 1, 18, 19, 28, 30, 31, 34, 39, 42, and 44 of the United States Code, Title 24 of the Revised Statutes is codified in Title 42 of the United States Code, and Title 70 of the Revised Statutes is codified in various sections of Titles 18, 38, 42, 43, 50 of the United States Code, but none of these sections in Title 42 of the United States Code are within Title VII or the ADA.  See 42 U.S.C. § 1988(a), References in Text; Table II to the United States Code.  The Court therefore agrees with Judge Posner, Judge Nelson, and Judge Reasoner that § 1988(a), by its terms, does not apply to the Rehabilitation Act, Title VII, or the ADA.  Indeed, the Court believes that the proper approach to the abatement of a claimant's Rehabilitation Act, Title VII, and ADA claims

Act should be construed as co-extensive with the ADA, the Court believes that the same logic

applies to Rehabilitation Act cases.  See Ferguson v. City of Phoenix, 157 F.3d at 673; Pottgen v.

Mo. State High Sch. Activities Ass'n, 40 F.3d at 930.

_____

is the approach that the Tenth Circuit originally took in Smith v. Dep't of Human Services. Specifically, the Court agrees with the Tenth Circuit's reasoning in Smith v. Dep't of Human Services that the proper approach in relation to these federal statutes in which Congress did not provide a provision for the claims' abatement is to look to the federal common law, which the Tenth Circuit held turns on whether the claim is punitive or remedial in nature.  Were this the case, B. Nordwall's Rehabilitation Act claim would survive J. Davis' death -- at the least to the extent that she seeks compensatory damages.

    Whereas the Court concludes that § 1988(a), by its language, does not apply to claims other than those arising under the laws in "titles 13, 24, and 70 of the Revised Statutes," 42 U.S.C. 1988(a), none of which include sections in Title VII, the ADA, or the Rehabilitation Act, the Sixth Circuit opinion on which the Tenth Circuit relied in Slade v. United States Postal Service to hold that the survivability of the plaintiff's Title VII claims survived the plaintiff's death -- Bennett v. Tucker -- is a case in which the Sixth Circuit correctly applied § 1988(a) to that plaintiff's § 1983 claim.  See Bennett v. Tucker, 827 F.2d at 67-68 (holding that the plaintiff's § 1983 claim survived her death, because, in the face of § 1983's silence in relation to survivability, "we must look to 42 U.S.C. § 1988, which provides that if federal law does not provide a rule of decision in a civil rights case, federal law will incorporate the appropriate state law").  Thus, the Tenth Circuit, although it never specifically adopted or explicitly applied § 1988(a) to the ADA, Title VII, ADEA, Equal Pay Act, or Rehabilitation Act claims in Slade v. United States Postal Service and Marks v. U.S. West Direct, has effectively -- and apparently contrary to § 1988(a)'s language -- adopted § 1988(a)'s application to those claims.

    In most cases, as the results in Slade v. United States Postal Service and Marks v. U.S. West Direct, and also the results in the District of Colorado's cases in Rosenblum v. Colo. Dep't of Health and Montez v. Owens, show, the results are the same: the plaintiff's compensatory damages claims survive the plaintiff's death, because the states' survivability statutes provide for the survivability of plaintiffs' personal injury lawsuits.  In New Mexico, however, the Tenth Circuit's adoption of § 1988(a) produces the opposite effect -- compensatory damages claims, at least under the Rehabilitation Act, but likely also under Title VII and the ADA, abate at the plaintiff's death.  Thus this result creates inconsistency in the application of a federal law, a result which, if the Tenth Circuit adhered to the analysis in Smith v. Department of Human Services, would produce a different result.  The Court therefore is of the opinion that the Tenth Circuit may have erred in Slade v. United States Postal Service by basing its conclusion that state law should fill the survivability provision's omission from Title VII on a § 1983 case, to which § 1988(a), by its plain language, applies.

    Nevertheless, given these Tenth Circuit precedent cases, which the Court is bound to follow on federal issues, see, e.g., Zamora v. Wells Fargo Home Mortg., 831 F.Supp.2d 1284, 1305 (D.N.M.2011)(Browning, J.)("While the Court realizes that its decision ... may in some ways be unfair and unduly harsh . . . , the Court is bound to follow binding precedent from the Tenth Circuit."), the Court concludes that it must follow the Tenth Circuit and look to New Mexico law to determine whether a plaintiff's Rehabilitation Act claim survives the plaintiff's death.

On the other hand, it may be that current federal common produces the same result. While the Tenth Circuit recognized in Smith v. Department of Human Services that the question of a federal law's survival "is governed by federal common law," Professors Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper assert that "the Supreme Court has put increasing emphasis on the notion that when determining what should be the content of federal common law, the law of the forum state should be adopted absent some good reason to displace it."  19 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Fed. Practice and Procedure: Jurisdiction § 4518, at 572-73 (2d ed. 1996).  Thus, in Kamen v. Kemper Financial Services, Inc., the Supreme Court of the United States held that, in general, "federal courts should 'incorporate state law as the federal rule of decision,' unless 'application of the particular state law in question would frustrate specific objectives of the federal programs.'"  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98 (1991)(alterations omitted)(quoting United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979)).

It is possible, therefore, and consistent with Tenth Circuit case law, to conclude that the federal common law incorporates state law for purposes of determining whether a Rehabilitation Act claim survives a claimant's death.  This conclusion reconciles any apparent conflict between the Tenth Circuit's approach to determining survivability of the ADEA claim in Smith v. Department of Human Services with its approaches to similar civil rights statutes in Slade v. United States Postal Service and Marks v. U.S. West Direct.  It also reconciles the apparent conflict between the Seventh Circuit's holding in Hutchinson v. Spink that, "whether by incorporation through federal common law or more directly (a question we need not resolve here), state law governs the survival of statutory civil rights actions like the ADA claim asserted," 126 F.3d at 898, and its holding in Fleming v. United States Postal Service AMF

O'Hare that 42 U.S.C. § 1988(a) does not apply to Title VII and the Rehabilitation Act, see 27 F.3d at 262.  Specifically, if current federal common law incorporates the applicable state law to determine the survivability of these federal causes of actions, because that is the result that § 1988(a)'s application produces in § 1983 civil-rights claims, the result is the same even if § 1988(a) does not formally apply.  The Court thus concludes that, as long as it does not conflict with the Constitution and federal law, the Tenth Circuit incorporates the applicable state law to determine whether Rehabilitation Act claim survives the claimant's death.

### b. The Applicable Survivability Law for Rehabilitation Act Claims in New Mexico is NMSA 1978, § 37-2-1.

The Court of Appeals of New Mexico has held that "[t]he statute governing which actions can initially be brought [after the tort victim's death] is NMSA 1978, Section 37-2-1." Padilla v. Estate of Griego, 113 N.M. 660, 663, 830 P.2d 1348, 1351 (Ct. App. 1992).  The Tenth Circuit has explicitly characterized Rehabilitation Act claims as personal injury claims: "Because a section 504 claim is closely analogous to section 1983, we find that section 504 claims are best characterized for personal injuries."  Baker v. Bd. of Regents of Kan., 991 F.2d at 632. Other United States Courts of Appeals which have similarly concluded that incorporation of applicable state law is appropriate to fill in the gaps that Congress left in the ADA and the Rehabilitation Act have uniformly looked to the appropriate state's personal injury law.  See, e.g., Hickey v. Irving Indep. Sch. Dist., 976 F.2d at 982-983 ("Of the state law claims governed by the Texas statutes of limitations, we find that personal injury claims are most nearly analogous to the discrimination are essentially claims for personal injury."); McCormick v. Miami Univ., 693 F.3d at 663-664 ("State statutes of limitations for personal injuries govern claims under the federal constitution and 42 U.S.C. § 1983. . . .  [C]ourts faced with ADA or Rehabilitation Act claims have also looked to the state's statute of limitations for personal injury actions."); Everett

v. Cobb Cnty. Sch. Dist., 138 F.3d at 1409-10 ("[W]e hold that Georgia's two-year statute of

limitations for personal injury actions should be applied to discrimination claims brought under

Title II of the ADA and the Rehabilitation Act.").   Because the Tenth Circuit incorporates

applicable state law to determine whether a Rehabilitation Act claim survives the Claimants

death, and because the Tenth Circuit has held that a Rehabilitation Act is "best characterized [as

a claim] for personal injuries," Baker v. Bd. of Regents of Kan., 991 F.2d at 632, the Tenth

Circuit would look to the state law regarding survivability: NMSA 1978, § 37-2-1.

**c.      Under the Applicable New Mexico Survivability Law, a Rehabilitation Act Claim Does Not Survive the Claimant's Death.**

New Mexico appears to be unique in its treatment of personal injury claims in relation to

whether these claims survive a plaintiff's death.   In 2006, the Tenth Circuit analyzed whether a §

1983 claim for excessive survived the plaintiff's death, and concluded that it did not, because it

concluded that, while under New Mexico law personal injury negligence tort claims survive the

plaintiff's death, intentional tort claims do not.   See Oliveros v. Mitchell, 449 F.3d at 1094-95.

The Tenth Circuit pointed out that New Mexico's survivability statute -- NMSA 1978, § 37-2-1 -

- changes the common-law rule that personal injury tort claims abated with either the plaintiff's

death or defendant's death, only by providing that the defendant's death does not abate the claim.

See 449 F.3d at 1094-95 (citing Rodgers v. Ferguson, 89 N.M. 688, 690, 556 P.2d 844, 846 (Ct.

App. 1976)(Wood, J.); NMSA 1978, § 37-2-1 ("The cause of action for wrongful death and the

cause of action for personal injuries, shall survive the death of the party responsible

therefor.")(emphasis omitted)).   The Tenth Circuit also pointed out that the Court of Appeals of

New Mexico has held that personal injury claims based on the tort of negligence survive the

plaintiff's death, because these torts did not come about until "approximately 1825," but the

Tenth Circuit noted that the Court of Appeals of New Mexico got there by distinguishing

negligence torts from "violent and intentional torts," which existed at common law.  Oliveros v.

Mitchell, 449 F.3d at 1094 (internal quotations omitted)(quoting Rodgers v. Ferguson, 89 N.M.

at 691, 556 P.2d at 847).   The Tenth Circuit in Oliveros v. Mitchell provided the following

explanation of Rodgers v. Ferguson:

> The claims in Rodgers stemmed from a car accident involving the defendants and
> Joseph Wheaton, who subsequently died from causes unrelated to the accident.
> After Wheaton's death, his estate sued the defendants for negligence. Since the
> facts did not fit within New Mexico's survival or abatement statutes, the court
> looked to the common law to determine whether the plaintiff's negligence claim
> survived Wheaton's unrelated death. Departing from the common law, the court
> held that it did. Id. at 847. In doing so, however, the court drew an important
> distinction between intentional tort and negligence claims, stating:
>
>> [H]istorical application of the non-survival rule was to violent and
>> intentional torts. It did not develop in connection with the type of
>> tort in this case -- negligence -- because the tort of negligence did
>> not evolve until approximately 1825.
>
> Id. The court concluded that "[a]bsent specific justification, the [common law
> non-survival] rule should not apply to torts which did not exist when the rule
> developed." Id. Thus, in addition to the causes of action listed in the survival
> statute, under Rodgers, personal injury claims arising from negligence survive the
> death of the would-be plaintiff. Importantly, the Rodgers court made clear that it
> was "express[ing] no opinion as to the non-survival of other actions under the
> common law," id. at 850, and it reaffirmed that the common law determines the
> survivability of claims not enumerated in New Mexico's survival statute, see id. at
> 849.

449 F.3d at 1094.  Based on this distinction, the Tenth Circuit held that "we are confident that

the New Mexico Supreme Court would interpret the survival statute as not applying to

intentional tort claims."  449 F.3d at 1094 (citation omitted).

Anytime that the Court sees the Tenth Circuit rely on Court of Appeals of New Mexico

decisions from over thirty years ago, it gives the Court pause.  Indeed, the Court has in the past

concluded that the current Supreme Court of New Mexico would decline to follow the Court of

Appeals of New Mexico's cases from the 1970s and 1980s.  See Rimbert v. Eli Lilly & Co., 577

F. Supp. 2d 1174, 1214 (D.N.M. 2008)("The Court believes that the Supreme Court of New Mexico would not, in 2008, adopt the doctrine of learned-intermediary and would decline to follow the Court of Appeals cases from the 1970s and 1980s.").  In <u>Rimbert v. Eli Lilly & Co.</u>, the Court concluded that the Supreme Court of New Mexico would decline to follow the Court of Appeals of New Mexico's 1974 and 1983 opinions in which the Court of Appeals adopted the learned-intermediary rule, and would likely remain as one of twenty-two states that had not adopted the learned-intermediary rule.  <u>See</u> 577 F. Supp. 2d at 1214-15.  The Court arrived at its conclusion because the rule is inconsistent with New Mexico's strict-liability jurisprudence, and because it leaves plaintiffs uncompensated, which butts up against the Supreme Court of New Mexico's policy reasons behind adopting strict liability:

> The primary reason that the Court believes that the Supreme Court of New Mexico would not adopt the learned-intermediary doctrine is that it is fundamentally inconsistent with New Mexico's strict-liability jurisprudence. First, New Mexico has adopted strict liability on product manufacturers to ensure that the risk of loss for injury resulting from defective products is borne by the suppliers, principally because they are in a position to absorb the loss by distributing it as a cost of doing business. The learned-intermediary doctrine shifts the risk to the physician and to the patient. If the Supreme Court of New Mexico adopts the learned-intermediary doctrine, the risk of loss will not be able to be spread, but will largely be borne by the physician and/or the patient. The Court does not believe that the Supreme Court of New Mexico would weaken this pillar of the strict-liability doctrine.

> Second, New Mexico also adopted the strict liability doctrine to promote fairness by ensuring that the plaintiffs injured by an unreasonably dangerous product are compensated for their injuries. The learned-intermediary doctrine would leave some plaintiffs uncompensated. The Court does not believe that the Supreme Court of New Mexico would choose a doctrine that would leave plaintiffs uncompensated when there does not appear to be a compelling reason for them to be uncompensated. The Supreme Court of New Mexico explained in <u>Brooks v. Beech Aircraft Corp.</u>, [120 N.M. 372, 375-76, 902 P.2d 54, 57-58 (1995)] that . . . . "imposing strict products liability serves the interests of fairness."

577 F. Supp. 2d at 1215 (citation omitted).  In this case, however, the question is whether the Supreme Court of New Mexico would follow the Court of Appeals of New Mexico in distinguishing intentional tort personal injury claims from negligence personal injury claims.

Weighing in favor of finding that the Supreme Court of New Mexico would not follow the Court of Appeals of New Mexico is that this conclusion cuts against New Mexico's endorsement of compensating plaintiffs as a matter of fairness.  Whereas the Court reasoned in Rimbert v. Eli Lilly & Co. that the Supreme Court of New Mexico, given its endorsement that the policy of fairness cuts against leaving plaintiffs uncompensated, would hesitate to adopt the learned-intermediary doctrine, adopting the Court of Appeals of New Mexico's position that intentional tort personal injury lawsuits -- and by implication Rehabilitation Act claims -- abate with the claimant's death, leaves a number of plaintiffs uncompensated.  Additionally, faced with a defendant's contention that, under NMSA 1978, § 37-2-1, an intentional tort claim for assault abates upon the defendant's death, the Court of Appeals of New Mexico concluded that it does not, reasoning that "we are unaware of any usage of the term 'cause of action for personal injuries' that would exclude [the] torts" of "libel, slander, malicious prosecution, or assault (the torts that abate [during the lawsuit] under [NMSA 1978,] Section 37-2-4)."[24]  Padilla v. Estate of Griego, 113 N.M. at 663, 830 P.2d at 1351.  Thus, after Rodgers v. Ferguson, in 1992, the Court of Appeals of New Mexico rejected an interpretation of personal injury -- as NMSA 1978, § 37-

_____

[24] Section 37-2-4 of the New Mexico Statutes Annotated provides the following in relation to survivability of claims when a party to the action dies during a pending action:

No action pending in any court shall abate by the death of either, or both, the parties thereto, except an action for libel, slander, malicious prosecution, assault or assault and battery, for a nuisance or against a justice of the peace [magistrate] for misconduct in office, which shall abate by the death of the defendant.

NMSA 1978, § 37-2-4 (alteration in original).

2-1 uses that term -- to "exclude . . .  specific torts."  Padilla v. Estate of Griego, 113 N.M. at 663, 830 P.2d at 1351.

The Court concludes, however, that the statute's plain language -- its silence as to any abrogation of the common law regarding a personal injury lawsuit plaintiff's death -- ultimately wins out, and that the Supreme Court of New Mexico would follow the Court of Appeals of New Mexico's conclusion in Rodgers v. Ferguson that intentional tort personal injury suits, as they did at common law, abate at the time of the plaintiff's death.  As Rodgers v. Ferguson noted, although the Legislature of New Mexico saw fit to override the common law rule that personal injury lawsuits abate at the death of either party in NMSA 1978, § 37-2-1, it only did so in regards to the tortfeasor's death; the Legislature did not speak to the effect of a plaintiff's death on a personal injury lawsuit:

> Section [37-2-1] expresses a legislative intent that specified actions shall survive. The wording of the statute does not show a legislative intent that causes of action not specified in the statute do or do not survive. The legislative intent was that survival of causes of action not specified in the statute depends on the common law.

Rodgers v. Ferguson, 89 N.M. at 693, 556 P.2d at 849.  Moreover, the Restatement (Second) of Torts recognizes that, at common law, tort claims abated at the time of either party's death.  See Restatement (Second) of Torts § 900(1) ("A cause of action for a tort may be discharged by   (a) the death of either party, in the absence of a statute providing for survival of the cause of action . . . .").  Given the Legislature's silence regarding intentional torts, which Rodgers v. Ferguson points out existed at common law, the Supreme Court of New Mexico would likely follow the common law to hold that the Legislature's silence in relation to a plaintiff's death causing the abatement of the plaintiff's personal injury lawsuit leaves in place the common-law rule that the plaintiff's intentional tort personal injury lawsuit abates at the time of the plaintiff's death.  See

- 72 -

Coffey v. United States, 906 F. Supp. 2d 1114, 1170 n.31 (D.N.M. 2012)(Browning, J.)("[T]he Supreme Court of New Mexico stated: "We have also been very willing to adopt the view of the Restatement of Torts . . . .")(quoting Schmitz v. Smentowski, 109 N.M. 386, 393, 785 P.2d 726, 736 (1990)).

After concluding that intentional tort personal injury claims abate at the time of the plaintiff's death, the Tenth Circuit went on in Oliveros v. Mitchell to hold that, because § 1983 claims "are necessarily predicated on intentional conduct," the plaintiff's § 1983 claims based on excessive use of force and unreasonable seizure are "most analogous to intentional tort causes of action." 449 F.3d at 1095. Thus, the Tenth Circuit upheld the district court's grant of summary judgment of the plaintiff's § 1983 claims "premised on intentional misconduct [because they] did not survive [the plaintiff]'s death." 449 F.3d at 1095.

In the Tenth Circuit, a Rehabilitation Act claim for compensatory damages, like the § 1983 claims for excessive use of force and unreasonable seizure in Oliveros v. Mitchell, are necessarily predicated on intentional conduct. See Barber ex rel. Barber v. Colorado Dep't of Revenue, 562 F.3d 1222, 1228 (10th Cir. 2009)("To recover compensatory damages under § 504, a plaintiff must establish that the . . . discrimination was intentional.")(emphasis added)(citing Powers v. MJB Acquisition Corp., 184 F.3d at 1152-53).[25]  Moreover, under the Rehabilitation Act, "'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." Barber ex rel. Barber v. Colorado Dep't of Revenue, 562 F.3d at 1228-29 (internal quotation marks and citation omitted).  Similarly, under § 1983, a

---

[25]  A deceased claimant cannot maintain an action for injunctive relief under the Rehabilitation Act.  See, e.g., Brown v. Town of Cary, 706 F.3d 294, 300 (4th Cir. 2013)("it is axiomatic that prospective injunctive relief could not be enjoyed by a deceased litigant . . . .") (internal quotation marks omitted).

prisoner-plaintiff can bring a claim for violation of the plaintiff's rights under the Eighth Amendment to the Constitution for a prison guard's deliberate indifference to a substantial risk of harm to the prisoner.  See Chavez v. Bd. of Cnty. Comm'rs of Sierra Cnty., 899 F. Supp. 2d 1163, 1179 (D.N.M. 2012)(Browning, J.)("The Supreme Court has held that 'a prison official's deliberate indifference to a substantial risk of serious harm' implicates the Eighth Amendment.")(quoting Farmer v. Brennan, 511 U.S. 825, 828 (1994)).   The Court therefore concludes that, given the Tenth Circuit's decision in Oliveros v. Mitchell, Rehabilitation Act claims are "most analogous to intentional tort causes of action."  449 F.3d at 1095.  Accordingly, the Court concludes that Rehabilitation Act causes of action in New Mexico do not survive the claimant's death.

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute."   Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See  28 U.S.C. §§ 1331-32.

### 1.  Supplemental Jurisdiction.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v.

Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept

of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary

jurisdiction.[26]  Federal courts may exercise pendent jurisdiction over state-law claims when

"state and federal claims . . . derive from a common nucleus of operative fact."  United Mine

Workers v. Gibbs, 383 U.S. 715, 725 (1966).  Supplemental jurisdiction gives federal courts the

flexibility to hear a cause of action after the introduction of third parties whose insertion into the

litigation is not supported by any independent grounds for federal jurisdiction, when those parties

share a common interest in the outcome of the litigation and are logical participants in

it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n. 18 (1978).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee

to analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV

09-0540 JB/CG, 2011 WL 6013547, at * 5 (D.N.M. Nov. 21, 2011)(Browning, J.)(citing

16 Moore's Federal Practice, § 106.04[5] (Matthew Bender 3d ed.)).   In response to the

Committee's findings regarding "pendent" and "ancillary" jurisdiction, Congress codified the

application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that they form part
> of the same case or controversy under Article III of the United States
> Constitution. Such supplemental jurisdiction shall include claims that involve the
> joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district

courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the

---

[26] The Tenth Circuit has noted that 28 U.S.C. § 1367 is Congress' intent to supersede the
common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted
legislation, codified at 28 U.S.C. § 1367 (1976 & Supp.1992), which supersedes the common
law pendent jurisdiction doctrine."  Baker v. Bd. of Regents of State of Kan., 991 F.2d at 634
(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992); Aschinger v. Columbus Showcase
Co., 934 F.2d 1402 (6th Cir. 1991)).

rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), *reprinted* in 22 Conn. L. Rev. 733, 787 (1990).

### 2. **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction, not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir.2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir.1998)("Section 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir.1994) ("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F. 3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir.1994) ("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)."); Bonadeo v. Lujan, No. CIV 08–0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  .  At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion.  See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should presume to decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining

state claims." Koch v. City of Del City, 660 F.3d at1228, 1248 (10th Cir. 2011)(quoting Smith

v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme

Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and
> to promote justice between the parties, by procuring for them a surer-footed
> reading of applicable law.  Certainly, if the federal claims are dismissed before
> trial, even though not insubstantial in a jurisdictional sense, the state claims
> should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that a

district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C.

§ 1367(c) applies.  See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4

(D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only

acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized that a

district court does not "abuse [its] discretion" when it declines to exercise supplemental

jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims

over which it has original jurisdiction[.]'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th

Cir. 2011)(unpublished).

## ANALYSIS

The Court concludes, as a matter of first impression in the Tenth Circuit and the United

States District Court for the District of New Mexico, that J. Davis' cause of action under § 504 of

the Rehabilitation Act abated at the time of his death on March 23, 2009.  Accordingly, the Court

grants Memorial Medical summary judgment on that basis.  The Court also concludes that, even

if J. Davis' claim did not abate at his death, summary judgment in favor of Memorial Medical is

nevertheless proper on B. Nordwall's Rehabilitation Act claim for compensatory damages,

because the undisputed material facts establish that Memorial Hospital did not intentionally

discriminate against J. Davis.  The parties do not dispute that B. Nordwall has made a prima facie case under the Rehabilitation Act.  See MSJ Response at 13 ("Defendant does not argue that Plaintiff cannot meet the elements of a prima facie claim under the Rehabilitation Act."). Because B. Nordwall asks for compensatory damages, the issue, then, is whether Memorial Medical intentionally discriminated against J. Davis, by acting with deliberate indifference to his rights under the Rehabilitation Act.[27]  Because the Rehabilitation Act claim fails and no federal law claims remain, the Court will remand the case to state court.

## I.    J. DAVIS' REHABILIATION ACT CLAIM ABATED AT THE TIME OF HIS DEATH.

The claimant for purposes of the Rehabilitation Act claim was deceased at the time B. Nordwall filed this claim.  Memorial Medical argues that a Rehabilitation Act claim abates at the time of the claimant's death.  It argues that the Tenth Circuit would determine whether a Rehabilitation Act claim survives a claimant's death based on New Mexico law and that, under New Mexico law, a Rehabilitation Act does not survive a plaintiff's death, because it would be construed analogous to an intentional tort, which the Tenth Circuit has held abates at the time of the claimant's death.  B. Nordwall argues that the claim survived J. Davis' death, because a Rehabilitation Act claim is more analogous to a personal injury negligence tort claim, which does not abate at the plaintiff's death under New Mexico law.  The Court finds that, consistent with the Tenth Circuit's opinion in Oliveros v. Mitchell, a Rehabilitation Act claim, analogous to an intentional tort claim, abates at the claimant's death.

---

[27] Although B. Nordwall does not request prospective injunctive, or declaratory relief, a personal representative is not entitled to injunctive relief under the Rehabilitation Act.  Cf. Plumley v. Landmark Chevrolet, Inc., 122 F.3d 308, 312 (5th Cir. 1997)(holding that a deceased claimant's causes of action under the ADA for both injunctive and declaratory relief "d[id] not survive" the claimant's death, as the personal representative could not meet the standing "threshold," because "[i]t is unlikely that Landmark will wrong Plumley again").

Although Congress did not provide a survivability provision in the Rehabilitation Act, the Court concludes that the Tenth Circuit would look to New Mexico survivability law in relation to personal injuries to fill in this omission from the Rehabilitation Act, "as section 504 claims are best characterized for personal injuries." Baker v. Bd. of Regents of Kan., 991 F.2d at 632.  Cf. Slade v. United States Postal Serv., 952 F.2d at 360 (holding that, because Oklahoma has a state survivability statute that provides for survivability of personal injury claims, a plaintiff's Title VII employment discrimination claim survived the plaintiff's death); Marks v. U.S. West Direct, 1998 U.S. App. LEXIS 31150, at *2 (holding that, because Colorado's personal injury law dictates that claim survives the claimant's death, the plaintiff's claims under the ADEA, Title VII, and the Equal Pay Act survived the plaintiff's death)(citing Slade v. United States Postal Serv., 952 F.2d at 360; Colo. Rev. Stat. § 13-20-101(1)).  New Mexico's survivability statute -- NMSA 1978, § 37-2-1 -- is silent, however, regarding the effect of a claimant's death on personal injury actions.

The Tenth Circuit in Oliveros v. Mitchell, however, looked to the Court of Appeals of New Mexico's decision in Rodgers v. Ferguson, in which the Court of Appeals of New Mexico analyzed NMSA 1978, § 37-2-1, and distinguished the tort of negligence from intentional torts to conclude that personal injury lawsuits based on negligence, as opposed to those based on intentional torts, survive the plaintiff's death, because negligence torts did not exist at common law.  See 449 F.3d at 1094 (citing Rodgers v. Ferguson, 89 N.M. at 691, 556 P.2d at 847).  The Tenth Circuit then held that, because § 1983 claims "are necessarily predicated on intentional conduct," the plaintiff's § 1983 claims based on excessive use of force and unreasonable seizure are "most analogous to intentional tort causes of action" and "did not survive [the plaintiff]'s death." 449 F.3d at 1095.  Because, under the Rehabilitation Act, "[t]o recover compensatory

damages under § 504, a plaintiff must establish that the . . . discrimination was intentional," Barber ex rel. Barber v. Colorado Dep't of Revenue, 562 F.3d at 1228 (citing Powers v. MJB Acquisition Corp., 184 F.3d at 1152-53), the Court concludes that Rehabilitation Act claims are also most analogous to intentional tort causes of action and do not, therefore, survive the claimant's death.

J. Davis died at his home on March 26, 2009.  See Complaint ¶ 47, at 7.  B. Nordwall filed her First Amended Complaint in in the Third Judicial District Court of New Mexico in Dona Ana County on March 23, 2012.  See Complaint at 1.  J. Davis' Rehabilitation Act claim therefore abated at the time of his death on March 26, 2009.  Because B. Nordwall did not file her cause of action before that time, J. Davis' Rehabilitation Act claim for compensatory damages abated before she filed the lawsuit.  Accordingly, the Court grants summary judgment in Memorial Medical's favor and dismisses B. Nordwall's Rehabilitation Act claim with prejudice.

## II.   MEMORIAL MEDICAL DID NOT ACT WITH DELIBERATE INDIFFERENCE TO J. DAVIS' RIGHTS UNDER THE REHABILITATION ACT BY FAILING TO PROVIDE AN ASL INTERPRETER WHEN THE HOSPITAL HAD POLICIES AND PROCEDURES FOR DISABLED PATIENTS AND MEMORIAL MEDICAL ACTED AFFIRMATIVELY TO ACCOMMODATE J. DAVIS' COMMUNICATION NEEDS.

B. Nordwall argues that Memorial Medical's failure to provide an interpreter constituted intentional discrimination by denying J. Davis equal access to medical treatment.  Memorial Medical denies that J. Davis received unequal medical treatment, and argues that its policies, procedures, auxiliary aids, and actions cannot support a finding that Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.  Memorial Medical had a policy in place to accommodate J. Davis' disability, provided J. Davis auxiliary aids, and attempted to meet his communication needs, which all demonstrate that Memorial Medical was

not deliberately indifferent to a substantial likelihood of a violation of J. Davis' rights under the Rehabilitation Act.   The Tenth Circuit has held that "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."   Powers v. MJB Acquisition Corp., 184 F.3d at 1153.  For B. Nordwall to make an actionable claim under the Rehabilitation Act, she must demonstrate that Memorial Medical knew its policies were likely to violate J. Davis' rights under the Rehabilitation Act, and that Memorial Medical then failed to act to prevent the violation.  Construing the facts in a light most favorable to B. Nordwall, the record does not, however, support such a finding.

B. Nordwall argues that Memorial Medical was deliberately indifferent to J. Davis' rights under the Rehabilitation Act when it failed to provide an interpreter after B. Nordwall's request. B. Nordwall argues that the ultimate question when determining deliberate indifference is whether a deaf person has equal access services.   See Tr. at 29:3-10 (Youngers).  B. Nordwall relies on Ulibarri v. City and County of Denver for the proposition that a policy and auxiliary aids to assist deaf patients is not enough, and the real question is whether the policy and auxiliary aids are "appropriately assessed and used."  Tr. at 28:24-29:2 (Youngers).  B. Nordwall argues that J. Davis' equal access to services should not hinge on whether "his family yells and screams and jumps up and down hard enough." Tr. at 29:10-11.   The issue, B. Nordwall argues, is whether Memorial Medical had knowledge of a likely harm to J. Davis' rights under the Rehabilitation Act.   See Tr. at 29:13-14.   B. Nordwall asserts that Memorial Medical had "institutional knowledge" that, without communication, a patient is unable to participate in his or her own care.  Tr. at 29:13-14.   B. Nordwall argues that Memorial Medical's reliance on J. Davis' family and his deaf girlfriend to interpret, instead of an ASL interpreter, created

communication issues that lead to J. Davis' restraint and sedation, which in turn prevented his participation in his own medical treatment.  See at Tr. at 33:5-34:8 (Youngers).

In addition, B. Nordwall asserts that policymakers at Memorial Medical, like the detention center staff in Ulibarri v. City and County of Denver, were insufficiently trained to interact with deaf people.  See Supplemental Response at 8.  B. Nordwall argues that having a written policy and procedure is not enough if inadequate training precludes the staff from following the policy, or if the staff ignores the policy.   In support, B. Nordwall points out that Abrams, who was responsible for promoting Memorial Medical policies, was unfamiliar with procedures for assessing deaf patients and with the term "auxiliary aids," a term which the Administrative Policy and Procedure Manual used to describe resources essential to deaf patients' accommodations.  See Tr. at 30:3-10 (Youngers).  In addition, B. Nordwall argues that Wilson, who was not specifically trained in communication strategies with deaf patients, assessed that J. Davis could understand despite the many medical records indicating that communication with J. Davis was difficult. See Tr. at 30:6-14.

The facts here are distinguishable from those in Ulibarri v. City and County of Denver. In Ulibarri v. City and County of Denver, there existed an issue of fact whether the deaf detainee lacked access to auxiliary aids because of ineffective staff training, or whether the inmate handbook made deaf detainees aware of the availability of auxiliary aids, so that the deaf detainee was denied access to jail services.   See 742 F. Supp. 2d at 1215.  Unlike the detention center in Ulibarri v. City and County of Denver, Memorial Medical eventually ensured that J. Davis, his family, and Memorial Medical healthcare providers had the option to call interpretive services.  See Motion for Summary Judgment ¶ 24, at 7 (setting forth this fact); MSJ Response ¶ 10, at 4 (not controverting this fact).  See also, Reply ¶ 10, at 4 (setting forth this fact).  Nothing

on the record here indicates that Memorial Medical denied J. Davis any assistive device, including low-tech auxiliary aids, or an interpreter.   On the contrary, Memorial Medical healthcare providers gave J. Davis a pen and paper to communicate and posted a list of interpreter contact information by his bedside. See Motion for Summary Judgment ¶¶ 18-19, at 6 (setting forth this fact); MSJ Response at 4 (not controverting this fact).

Furthermore, in Ulibarri v. City and County of Denver, the detention facility lacked policies for assessment and documentation of a deaf detainee's communication preferences, and lacked recordkeeping procedures for notes written between deaf detainees and staff, and the facility's staff lacked knowledge for obtaining a sign language interpreter.   See 742 F. Supp. 2d at 1206.   At the time of the deaf detainees' arrests, the facility did not appear to have a written policy directing how to obtain interpretive services.   See 742 F. Supp. 2d at 1206.   The detention center offered an elective, two-hour training for the facility's officers "covering such topics as how to obtain and work with a sign language interpreter, terminology about communication with deaf people, descriptions of the deaf and hard of hearing communities, recognizing deafness, and types of communication modes."   742 F. Supp. 2d at 1206.   Memorial Medical, in contrast, had a functional policy in place, and multiple MMC employees testified that they understood how to obtain resources after assessing the patient's needs.   See Surreply ¶ 6, at 3-4.   In addition, Memorial Medical administrators indicated a willingness to accommodate interpreter requests for J. Davis by meeting with J. Davis' family, attempting to follow the care plan developed, and providing contact information for interpretive services.   See MSJ Response ¶ 33, at 7 (setting forth this fact); Reply ¶ 10, at 4 (not controverting this fact). See also Motion for Summary Judgment ¶ 24, at 7 (setting forth this fact); MSJ Response ¶ 10, at 4 (not controverting this fact).   Additionally, Memorial Medical policymakers appeared willing to

follow policy as indicated in the electronic mail transmissions between them.  See MSJ Response ¶ 37, at 8 (setting forth this fact); Reply at 4 (not controverting this fact).   While Memorial Medical staff was not trained specifically to communicate with deaf patients, Memorial Medical staff was trained to recognize patients' communication issues and to obtain appropriate resources.  See MSJ Response ¶ 47, at 10 (setting forth this fact); Reply at 5 (not controverting this fact).  While Abrams' deposition indicates that she was unfamiliar with the term "auxiliary aids," she was familiar with Memorial Medical's auxiliary aids, and was also familiar with providing those aids for deaf patients.  See Reply ¶ 13, at 4.  Memorial Medical's failure, if any, to accommodate J. Davis' disability thus did not rise to the level of the detention facility's systematic failures in Ulibarri v. City and County of Denver.   On the contrary, Memorial Medical administrators and healthcare providers acted, arguably with faults, to accommodate J. Davis according to its policy.

The Court holds that, because Memorial Medical had a policy and procedure to provide appropriate auxiliary aids for deaf patients, even if it made mistakes while executing its policy, Memorial Medical attempted to accommodate J. Davis, which precludes finding that Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act. Memorial Medical, just like the defendant hospitals in Saltzman v. Board of Commissioners of the North Broward Hospital District and Freydel v. New York Hospital, did not execute its policy mistake-free, but each hospital attempted to follow its policy to accommodate patients in compliance with the Rehabilitation Act.

B. Nordwall is correct that a policy and procedures alone are not enough to preclude deliberate indifference to J. Davis' rights under the Rehabilitation Act.  Appropriately trained hospital must also attempt to accommodate a patient with auxiliary aids, and cannot ignore

requests or deny access to auxiliary aids.  Memorial Medical healthcare providers' acted in compliance with their training when, without any prompting by J. Davis' family, Memorial Medical healthcare providers gave J. Davis a pen and paper, a "low tech" auxiliary aid. In addition, Memorial Medical healthcare providers attempted to communicate with J. Davis through other individuals who could sign, just as the healthcare providers in Saltzman v. Board of Commissioners of the North Broward Hospital District provided R. Saltzman with alternative auxiliary aids but failed to provide an interpreter.  Memorial Medical healthcare providers followed Memorial Medical policy and procedures, and attempted to communicate with J. Davis through appropriate auxiliary aids, which precludes finding Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.

Furthermore, once B. Nordwall requested an interpreter, Wilson posted interpreter contact information and directed the family to call an interpreter whenever needed, just as the healthcare providers in Freydel v. New York Hospital directed that deaf patient's family to appropriate resources.  Wilson instructed both Memorial Medical healthcare providers and J. Davis' family to call an interpreter whenever one was needed, just as hospital staff instructed the Freydel family to contact the Patient Services Agency for interpretive services in Freydel v. New York Hospital.  As the policies, procedures, auxiliary aids, and hospital's responses in Saltzman v. Board of Commissioners of the North Broward Hospital District and Freydel v. New York Hospital precluded finding that the hospitals acted with deliberate indifference to the deaf patients' Rehabilitation Act rights, Memorial Medical's policies, procedures, auxiliary aids, and response to J. Davis' family's requests preclude finding Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.

Moreover, Memorial Medical's response to J. Davis' request is not analogous to <u>Loeffler v. Staten Island University Hospital</u>, where the Second Circuit held that the hospital's response could support a reasonable jury finding that the hospital acted with deliberate indifference to Loeffler's Rehabilitation Act rights.  While both hospitals had policies for accommodating deaf patients, the hospital in <u>Loeffler v. Staten Island University Hospital</u> failed, even when arguably given weeks of advance notice, to arrange for interpretive services.   Unlike the defendant hospital healthcare providers in <u>Loeffler v. Staten Island University Hospital</u>, who allegedly ignored the deaf patient's family requests, Memorial Medical healthcare providers quickly responded to B. Nordwall's initial request for a meeting.  While the parties dispute who initiated the second meeting, this dispute is immaterial.  The material fact is that Memorial Medical and J. Davis' family met a second time to discuss J. Davis' treatment plan, which resulted in Wilson instructing the family and Memorial Medical healthcare providers to call an interpreter when necessary.  <u>See</u> MSJ Response ¶ 35, at 7-8 (setting forth this fact); Reply ¶ 14, at 4 (not controverting this fact).  Whereas a dispute about the number of interpreter and auxiliary aid requests, and the hospital's response, exists in <u>Loeffler v. Staten Island University Hospital</u>, nothing on the record indicates that Memorial Medical dismissed or ignored J. Davis' family's requests for a meeting, auxiliary aids, or even an interpreter.  While factual issues precluded summary judgment in <u>Loeffler v. Staten Island University Hospital</u>, these distinctions demonstrate that the record here does not support a finding that Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act.

Despite B. Nordwall's argument that Memorial Medical's policy, procedures, and implementation of the policy and procedure was unsatisfactory, the undisputed facts demonstrate that she has not met the burden that the Rehabilitation Act requires.   While B. Nordwall's

portrait of J. Davis' stay at Memorial Medical sheds light on the possible flaws in MMC's actions, these flaws -- even viewed in a light most favorable to B. Nordwall -- do not show that Memorial Medical acted with deliberate indifference to J. Davis' rights under the Rehabilitation Act during his February, 2009, stay at Memorial Medical.  B. Nordwall is therefore not entitled to compensatory damages under the Rehabilitation Act, and the Court will thus grant the request for partial summary judgment in the Motion for Partial Summary Judgment on Plaintiff's Claim Under the Rehabilitation Act and Memorandum in Support.

### III.   THE COURT WILL DECLINE SUPPLEMENTAL JURISDICTION AND REMAND TO THE THIRD JUDICIAL DISTRICT COURT FOR THE STATE OF NEW MEXICO.

After entering summary judgment on and dismissing the federal claims, no federal claims remain in this case.  Both parties concede that remand to state court is appropriate if the Rehabilitation Act claim fails.  See Tr. at 63:6-8 (Youngers); Tr. at 63:17-24 (Oertle). Accordingly, given the Tenth Circuit's guidance that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims," Kock v. City of Del City, 660 F.3d at 1248, quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d at 1156), the Court will decline to exercise supplemental jurisdiction over the remaining state law claims, and will remand to the state court from which Memorial Medical removed this case.

**IT IS ORDERED** that: (i) Defendant PHC-Las Cruces, Inc., d/b/a Memorial Medical Center's Motion for Partial Summary Judgment on Plaintiff's Claim under the Rehabilitation Act and Memorandum of Support, filed on September 20, 2012 (Doc. 41), is granted; (ii) Plaintiff Bilye Nordwall's cause of action under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, in Count III of her First Amended Complaint, filed in state court on March 23, 2012, filed in federal

court on April 24, 2012 (Doc. 1-1), is dismissed with prejudice; and (iii) this case is remanded to the Third Judicial District Court, Doña Ana County, State of New Mexico, because no federal claims remain.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Roseanne Camunez
Joleen K. Youngers
Camunez Law Firm
Las Cruces, New Mexico

> *Attorneys for the Plaintiff*

Michael J. Dekleva
Holly E. Armstrong
Rebecca Kenny
Madison, Harbour & Mroz PA
Albuquerque, New Mexico

-- and --

Kevin Kuhn
Stephen E. Oertle
Wheeler Trigg O'Donnell, LLP
Denver, Colorado

> *Attorneys for the Defendant*